[Civ. No. 34020. Second Dist., Div. Five. July 17, 1970.]

WESTERN BOARD OF ADJUSTERS, INC., Plaintiff and Respondent, v. COVINA PUBLISHING, INC., et al., Defendants and Appellants.

**COUNSEL**

Fischmann & Wallerstein, Milton B. Miller, B. Wallace Fischmann and Michael R. Polley for Defendants and Appellants.

Barnard F. Klein and Phalen G. Hurewitz for Plaintiff and Respondent.

## OPINION

**REPPY, J.**—This is an appeal from an order (minute order) made June 10, 1968, denying the motion of defendants Covina Publishing, Inc., a corporation, (hereinafter, Covina), and R.G.S. Corporation, a corporation (hereinafter, R.G.S.) to discharge a writ of attachment for $150,000, secured by plaintiff, Western Board of Adjusters, Inc., a corporation (hereinafter, plaintiff) on May 17, 1968, and levied thereafter.

### THE CIRCUMSTANCES

On April 26, 1968, plaintiff filed a complaint against Marvin Miller as an individual (hereinafter, Miller), Marvin Miller Enterprises, Inc., (hereinafter, Miller Enterprises), Collectors Publications, Inc., (hereinafter, Collectors), Associated Professional Services, Inc., (hereinafter, Associated), Covina, and R.G.S., with appropriate allegations supportive of the contention that each defendant was the *alter ego* of the other. Although at one point, the Miller interests asserted that the corporations were independent of one another, the trial assumed the *alter ego* statuses for the purpose of considering the motions, and no appellate attack is made against this position.

In the first cause of action plaintiff alleged that Miller Enterprises was in default on a promissory note drawn August 12, 1965, in favor of plaintiff's assignor for collection, Danner Press of Canton, Inc., (hereinafter, Danner), in the sum of $605,438.26 (hereinafter, the $605,438.26 note).

In the second, third and fourth causes of action, plaintiff alleged, on common counts, that each of the defendants was on or about January 17, 1967, indebted to Danner in the sum of $28,804.13, which debt became due and was unpaid. (Hereinafter, the $28,804.13 claim.)

In the fifth cause of action plaintiff alleged that Associated was in default on a promissory note drawn January 24, 1965, in favor of plaintiff's assignor for collection[1] Tyler Printing Company, a corporation, (hereinafter, Tyler) in the sum of $31,289.44 (hereinafter, the $31,289.44 note).

Also, on April 26, 1968, plaintiff filed the declaration for attachment of its president, seeking a writ in the sum of $75,000, in which it was declared that defendants were indebted to plaintiff upon "Common Counts and Promissory Notes" (plural). Originally the form language that the payment of the obligations had not been secured was not altered, but before the hearing plaintiff filed an amended declaration saying that the $605,-

---

[1]There was an intermediate assignee for collection, W. A. Krueger Company.

438.26 note was secured but the security had become valueless. Writs were issued to service officers of various counties.

A levy of attachment was made on 4.24-acre residence on Holt Avenue in the City of Covina standing in the name of R.G.S. and on personal property contained in the business facility of Covina on Proctor Avenue, City of Industry, consisting chiefly of an inventory of books (ultimately agreed to be 2,600,000), processing equipment and office furnishings by placing a keeper on the premises.[2] Garnishments were made on certain parties assertedly obligors of one or more of the defendants.[3]

On May 10, 1968, Miller, Covina, and R.G.S. (at times, collectively, defendants) noticed a motion for an order that would discharge the writs or, alternatively, quash the levies and garnishments on property having a value in excess of the amount of the writ, $75,000. The grounds were that the indebtedness represented by the $28,804.13 claim (as well as the $605,438.26 note) was secured and that the security had not become valueless (Code Civ. Proc., § 537, subd. 1), and that property having a worth much in excess of the amount of the writ had been attached.

A hearing was conducted on May 16, 1968. A copy of one of the security agreements was admitted in evidence. It contained a clause that the security was given for the purpose of securing payment of the $605,438.26 note "and all advances for indebtedness hereafter arising whether evidenced by promissory notes or not. . . ." It was on this that defendants based their contention that the subsequent Danner claim of $28,804.13 was secured, making the remedy of attachment unavailable.

The $605,438.26 note contained a clause saying that right was granted to Danner to assign it "and any security pledged for the payment thereof," (indicating that the giving of security was contemplated) and another clause reading that Miller Enterprises "agrees that an attachment may be issued in any action brought for collection of this Note . . . ." despite the fact that, according to expectations, the note was going to be secured. The contemporaneously executed security agreement contained a clause providing that it (the security arrangement) should "in no way diminish . . . any rights [perhaps including attachment] which . . . [might] exist

<hr>

[2]There also was an attachment of merchandise in possession of a carrier, Western Gillette, which was discharged because the goods were in transit.

[3]There appears to be a conflict between the contentions and the record as to what garnishments were made under this writ of attachment and under a second writ of attachment, mentioned hereinafter, but the problem is not serious. At the first writ hearing the trial court assumed the amounts asserted by defendants. The returns of the garnishees, when they came in, essentially were negative. The worthlessness of the second garnishments probably was accepted by the trial court at the second hearing.

on the part of Danner to recover said . . . [$605,438.26] from . . . [Miller Enterprises]." On the basis of these features in combination it was argued by plaintiff that there had been a waiver of the rule disallowing attachment on secured claims and that it had the right to attach for the $605,438.26 note, whether its security had become valueless or not.

Declarations bearing on the issue of the worth of the property attached were submitted and argued. The court was informed that some of the books were involved in obscenity charges in criminal court.

The court denied the motion to discharge the writ *in toto*. It determined that an excessive worth of property had been attached and ordered 2,200,000 books released from the attachment. It sustained the attachments on the Holt Avenue real property and on 400,000 books and the processing equipment and office furnishings in the Proctor Avenue business facility. It determined that the worth of the properties which it allowed to remain under attachment for the two lesser obligations was not excessive for the $75,000 writ.[4]

An overall analysis of the trial court's holding satisfies us that it took the position (for what reason being unclear) that it would consider that the $75,000 writ would apply only to those obligations wherein the problem of security and its original and later value were not concerned. Therefore, it must have given attention to the security for future advances and decided that the clause paraphrased above would not be applied to Danner's subsequently arising claim against Miller Enterprises of $28,804.13, probably on the basis that such a provision was intended to benefit the creditor and could be rejected by it, or could not be foisted upon it in the circumstance wherein the prior debt had not been substantially liquidated or the value of the security substantially increased, or both (none of which factors evolved in the instant case); and it must have given attention to the problem of waiver of the rule precluding attachment in suits on secured obligations and decided that the indicated language did not amount to such or that it would not sanction a waiver on grounds of public policy, and, therefore, determined that the $75,000 writ would not be taken as applicable to the $605,438.26 note. The trial court no

---

[4]Equity in the Holt Avenue property was taken at nominal value, the receivables were estimated at about $21,000, and the processing equipment and office furnishings at about $2,000, leaving a need of about $52,000 from the books. The trial court rationalized that some of the books were worth more than others (those subject to obscenity charges worth less because of probable hesitancy of buyers) and that, on an average basis, each book had a marshal's-sale-value between a liquidation price (about 1.5¢) and a wholesale selling price (about 70¢) but closer to the liquidation figure. The trial court did not specify what this price was, but probably it was about 13¢ per copy, making $52,000 for the 400,000 books.

doubt was also motivated by the circumstances that the $75,000 was an entirely appropriate amount for the two lesser obligations when interest was added to both and attorney's fees were added to the note.

At the direction of the trial court, defense counsel prepared a written order.[5] Neither plaintiff nor defendants appealed this order.

However, on May 17, plaintiff secured a second writ of attachment specifying the amount thereof as $150,000. Although the declaration presented to secure it referred to all of the three claims and mentioned common counts and promissory notes (plural), it is clear that, and later the trial court and the parties considered that the second writ was issued to gain protection for collection of judgment on the first cause of action (the $605,438.26 note).[6] The declaration recites that the $605,438.26 was secured but that the security had become valueless. A bond of $75,000 was posted.

Although it may be that the levy of the second writ of attachment for $150,000 was intended to be made only on the 2,200,000 books not held under the first attachment and to garnish some additional accounts, apparently by means of replacement of a keeper all of the books, processing equipment and office furnishings at the Proctor Avenue business facility again were attached.[7] Third party claims were filed as to certain of the processing equipment by Dexter Company, Singer Credit Corporation and Lawson Company.[8]

On May 29, 1968, Covina and R.G.S. (not Miller this time) noticed a motion (to be heard June 10, 1968) to quash the $150,000 writ of attachment issued May 17, on the ground that the conceded security for the $605,438.26 promissory note had not become valueless, or, in the alternative, to order the filing of a larger undertaking for the $150,000

---

[5]This order makes the disposition above specified and in doing so recites that the 400,000 books retained under attachment have a minimum selling price to booksellers (distributors) of 70¢ per copy. (It is felt that the monetary figure of 70¢ was for identification only.)

[6]This seems proper because by the prior order the $28,804.13 claim and the $31,289.44 note were protected in the maximum amount by as much attached property as the trial court would allow.

[7]The marshal's return includes a copy of the inventory made in connection with the levy of the April 26 writ of attachment and adds another list of property. Nothing in the record on appeal or in the superior court file indicates that this second writ was levied on the Holt Avenue real property. A levy was attempted on some real property on Glen Allen Drive in West Covina, but apparently this was not perfected. Rule 12a allows us to call up and examine the file lodged with the superior court, which we did.

[8]Dexter, $20,000, but title already passed; Singer, contract for $8,115.83, $810 unpaid balance; Lawson, reasonable value $20,000, unpaid balance, $15,800.

writ and, in effect, to discharge the levies on properties having a worth in excess of $150,000.

In his declaration, Miller described the alleged security as an assignment of copyrights and negatives of publications owned by Miller Enterprises and Associated, including "Chaplin v. Chaplin" and "History of the Devil," and of accounts receivable and general intangibles then owed, or to become owed, by Kable News Company (hereinafter Kable) to Miller Enterprises and Associated. Miller apparently had in mind as one purported intangible a damage claim derived from the alleged failure of Kable to use reasonable efforts to sell books consigned to it.

At this point it is appropriate to deal with one of defendants' contentions on appeal, that the May 29 notice included a motion for a reconsideration by the court of the issues explicitly and implicitly resolved against them in the hearing of May 16, 1968, that the trial court did reconsider such issues, again adversely, and that they are, therefore, proper subjects for consideration on the appeal. Defendants did not expressly notice or make such a motion. However, they were making such a request,[9] and plaintiff took it that way and argued to the trial court that it should not reconsider such issues. On appeal plaintiff asserts that the court did not reconsider such issues, that they are not now properly subject to consideration of this court, the rulings thereon having become res judicata because no appeal was taken from the first order made May 16, 1968. Before the trial court, plaintiff urged that if it did decide to set aside its prior findings and order, it should allow a full presentation in the reconsideration. Plaintiff attached to its opposition papers a declaration of its president relating to the value of the Holt Avenue real property,[10] and in oral statements made to the court at the June 10 hearing, its attorney advised that it was prepared to call a number of witnesses.

We are satisfied that the trial court did not grant a request for reconsid-

---

[9] One motion noticed was to quash all levies against all properties except the Holt Avenue realty "in any combination of writs issued . . . ," and to reconsider the value of the Holt Avenue property, apparently on the grounds that the $28,804.13 claim should be found to be secured, under the future obligations concept (in reversal of the prior ruling), as well as the $605,438.26 note and that the Holt Avenue realty was adequate collection protection for the $31,289.44 note, the only unsecured obligation. Defendants argued this item in their supporting points and authorities and orally at the hearing. In the papers supporting the noticed motion were a title report, assessor's statement, and Miller's opinion (as owner) and a professional appraiser's documented opinion bearing on the worth of the equity of the Holt Avenue real property, and counsel discussed its value at the hearing.

[10] The declaration presented a copy of a marshal's notice of sale of the Holt Avenue realty under writ of execution issued out of the Riverside County Municipal Court for a balance of $325.40. (At oral argument before this court counsel advised that this amount had been paid off and the judgment lien cleared.)

eration and did not officially reconsider the issues covered by its rulings of May 16, 1968, either because the motion had not been formally made (the indirect request was not sufficiently appropriate) or because, although it gave heed to the request implicit in the moving papers, it exercised the discretion which was its (2 Witkin, Cal. Procedure (1954) Proceedings Without Trial, § 12, p. 1649, 1967 Supp. pp. 589, 590) by disallowing the request. We analyze some of the factors supportive of our conclusion.[11]

Although at the hearing there was brief discussion of an equity figure for the Holt Avenue property, defendants' attorney merely said that he was "hoping" that the trial court was considering its value.

After considering the opposing supportive papers and hearing counsel argue, the trial court closed and hearing without taking further evidence. This strongly indicates that the trial court did not reconsider the issues covered by its prior ruling, because, otherwise, it would have allowed plaintiff to put in its proffered evidence. It is true that the trial court made tangential reference to the dispute over the worth of the Holt Avenue real property, but it never made a ruling on the new evidence included in defendants' supporting papers. Otherwise the trial court confined its explanatory remarks to one of the security items (purported obligation of Kable to pay the Miller interests for books on consignment) and to the worth of the books under the second attachment (the intangible factor of the criminal proceedings entered into the question; there had been no attempt by either party at segregation between those subject to such proceedings and those not). It then limited its ruling to the determinations that the securiy for the $605,438.26 note had been rendered valueless[12] and that the worth of the books under attachment, at that particular point in time, was an indeterminate factor which it could not measure.

Prefatory to this ruling the trial court did observe, ". . . [W]e have . . . before us today, a $150,000 attachment plus the $75,000 attachment"; but

---

[11]Perhaps surfacely inconsistent with our conclusion is the circumstance that counsel for plaintiff, in summing up, after assuming that the trial court was going to agree with plaintiff that the only item to be considered was the worth of "the items held under this security [*sic*—attachment] . . . , basing that decision [*sic*—position] on recognizing that on May 16th the other matters were determined by the Court . . .", listed the Holt Avenue realty as an item to consider. However, there is intimation in the record that the parties and the trial court, for a time at least, labored under the impression that the Holt Avenue property had been relevied on. It was not. (See footnote 7, *supra.*) It may be that plaintiff's counsel felt that because of such a relevy the trial court might allow reconsideration of this one value item. Otherwise, this reference to the Holt Avenue realty was inadvertent.

[12]Its preliminary finding that the $605,438.26 note was secured obviously was a reiteration (not a reconsideration) of this implied finding at the first hearing made as a premise to its consideration of whether that security inured to the subsequent $28,864.13 obligation.

reference to the later item did not necessarily imply that the trial court had decided to reconsider its May 16 ruling with respect to the $75,000 attachment. It could have meant, and probably did mean, that in dealing with the issues raised with respect to the $150,000 attachment, it took cognizance of what properties were covered by the $75,000 attachment and what issues had been determined in the attack against it.

■ Thus, there having been no reconsideration of the issues explicitly and implicitly passed upon at the May 16 hearing, right or wrong, those rulings remain effective and binding upon the parties. Moreover, any subject touched upon but not passed upon at the May 16 hearing (rightly or wrongly) remained open and was a proper subject of ruling at the second hearing. We note that the result was in part unfavorable to each side. We set out the gist of that result in aid of defining the issues at the second hearing, which are the only ones that can be the subject of the present appeal.

1. As indicated, the $75,000 writ was processed only as to the $28,804.13 claim and the $31,289.44 note. Essentially this was unfavorable to plaintiff.

2. The worth of the properties which the trial court allowed to remain under attachment, the Holt Avenue realty, the accounts due from customers, the processing equipment and office furnishings at the Proctor Avenue facility and the 400,000 books did not have a combined value which was excessive for the $75,000 writ. This was unfavorable to defendants.

3. Also as indicated, the clause in the security agreements to the effect that the security was given for the purpose of securing the $605,438.26 note and all future advances did not apply to the $28,804.13 claim. This was unfavorable to defendants.

4. As suggested, the clauses in the $605,438.26 note and security agreements, in effect indicating that attachment might issue and creating a waiver of the rule disallowing that remedy for secured obligations, would not be applied against defendants, probably on the ground that such would be against public policy. This was unfavorable to plaintiff.

5. Having made the decision that the $75,000 writ was for the two lesser obligations only, the trial court did not officially inquire into the question of initial value of the security for the $605,438.26 note and its claimed dissipation; did not, as urged by plaintiff at the second hearing, rule that the burden was on defendants to prove that the security value had vanished and that they had not sustained that burden. This factor was unfavorable to plaintiff.

This means that the issues which were to be determined at the second hearing were limited to these:

1. Was the defect in the affidavit for attachment under the cause of action for the $605,438.26 promissory note, consisting of the failure to allege that the dissipation of value of the security was not caused by any act of the plaintiff, curable and cured by amendment or evidence at the hearing?

2. Had the security for the $605,438.26 note some value at the time it was identified and provided by the agreement and did it become valueless without any causative act by plaintiff by the time the writ of attachment was applied for?

3. Or, was the security in its entirety valueless at the time given and did its acceptance nonetheless by plaintiff preclude attachment?

4. Assuming attachment was available, was there an excessive amount of property attached?

5. Was there a waiver by defendants of the requirements of an undertaking to support the writ of attachment which would apply to anything above the $75,000 posted? If not, or if plaintiff was estopped to assert such a waiver, was a $75,000 bond sufficient?

Returning to a consideration of what the parties submitted to the trial court with respect to these issues, we note the following: defendants furnished copies of the financing statements on file with the Secretary of State disclosing the continued existence of the security agreements, a copy of a United States bankruptcy[13] order as to Associated reciting that an inventory of unliquidated claims against Kable had value upon which recovery might be had in the future but upon which the trustee was currently unable to realize, a declaration of one Walter Hurst (the attorney representing the Miller interests in the action involving Kable) in which he rendered the opinion that his clients should recover $800,000, a declaration of Miller giving information on the security transaction of Miller Enterprises and Associated with Danner, estimating more than a nominal worth for the attached books in the Proctor Avenue facility, listing some garnishments of considerable amounts and stating that the marshal was about to remove the processing equipment and furnishings worth $100,000 from the Proctor Avenue facility. Plaintiff presented copies of third party claims[14] made as to the equip-

---

[13]An involuntary bankruptcy proceeding against Associated was initiated by Danner and Krueger (the intermediate assignee of the $31,289.44 note of which Tyler was the original holder). Involved was a $57,000 promissory note which Danner got Associated to sign to reflect that part of the ledger account carried by Danner for Miller Enterprises which was attributable to Associated (which apparently withdrew that much from the $605,483.26 note); but Associated's inventory and claims against Kable apparently are still involved in the instant suit because left unadministered, and Associated is a party to the instant action subject to the *alter ego* contention.

[14]See footnote 8, *supra.*

ment and furnishings, copy of a Los Angeles municipal court (Citrus district) misdemeanor complaint against Miller and Covina (two books involved), copy of a United States District Court indictment (five books involved), and a lengthy declaration of John Glenn, attorney for Danner. In it he: (1) gave the history of the $605,438.22 note and the security therefor; (2) declared that his investigation showed that "Chaplin v. Chaplin" and "History of the Devil" were "the only two books in which Miller Enterprises or Miller seemed to have some claim of ownership"; that Miller signed for Miller Enterprises even though "he said that he did not know whether in fact the company was the owner of the books"; that Miller promised to check his records, never did, but later expressed the opinion that most of the publications printed by Danner were owned by himself; and that as to the security given by Associated his examination of three more books "indicated possible rights in Associated"; (3) made comprehensive declarations concerning the financial dealings between Kable and Miller Enterprises and Associated in which he included information concerning conferences when Miller was present with Kable's attorney and with one Kass, a certified public accountant retained by Glenn to check Kable's books, all indicative of a then existing situation wherein Kable owed nothing to Miller Enterprises or Associated, due to the fact that Kable had books on consignment only, had made advance payments to Miller Enterprises and Associated, and had sold insufficient books to cover its advances;[15] asserted that he had gotten advice from copyright counsel that rights in "History of the Devil" probably were valueless because it was written by DeFoe in the 18th century; that there was a possibility that there were rights in the "Chaplin" text, but a search at federal copyright offices would have to be made to ascertain if such was the fact; (5) declared that he was informed by Kable that thousands of the books had been returned to Miller; (6) declared that in the case of many of the books, of which the Miller interests had copyrights and negatives, the subject matter was out of date and that said books satisfied no known demand, exemplified by the circumstances that the "Chaplin" divorce material had been surpassed for lurid detail by subsequent domestic relations suits; (7) advised of the bankruptcy proceedings initiated as to Associated and of being told by the trustee's attorney that no prospect of recovery from Kable had transpired and that the matter had been closed in February 1966 as a no-asset case; and (8) declared that he had examined the lawsuit between Kable and Miller Enterprises and that it was his belief that no monies were due from Kable to Miller Enterprises, asserting it to be his

---

[15]He attached a letter from Kable's general counsel informing that final settlements showed Associated overpaid $77,067.93, Collector's overpaid $15,005.20, and Miller Enterprises overpaid $26,394.12.

knowledge that the contracts did not require Kable to make any payments unless books were sold by its dealer outlets.[16]

A hearing was conducted on June 10, 1968. Most of the argument had to do with whether the security given by the Miller interests for the $605,438.26 note had any value at any time (pertinent to the right to attach issue) and with the worth of the personal property attached, especially the effect of the criminal proceedings on a forced-sale price of the remaining 2,200,000 books (pertinent to the over-attachment issue).

Plaintiff's counsel did not discriminate particularly between security values at the time the agreement was executed and the time the writ was obtained, but did urge that "the security had become valueless." He contended that the tort claim against Kable was not covered by the assignment, or was nonassignable, or, in any event, of no value, and that the copyrights and book negatives were valueless. Defendants' attorney argued that there was still value to the security and, alternatively, that if the security was valueless at the time the writ was secured, it had also been valueless when given and that plaintiff took it that way, knowing what it was, and was precluded from using the remedy of attachment, citing *Giandeini* v. *Ramirez,* 11 Cal.App.2d 469 [54 P.2d 91]. He urged that the tort claim was an intangible and assignable and that Kable still had many books on consignment subject to reclaim by the Miller interests which had not become valueless.

Plaintiff's counsel further argued that the worth of the attached books was indeterminate because of the risk of criminal involvement a purchaser would be taking, that the attached processing equipment and office furnishings were of little worth because of the third party claims, that the garnishments had essentially negative returns, and that all this should preclude the release of any of the property under attachment. The defense urged the trial court not to accept the garnishees' figures and argued that the attached books at the Proctor Avenue facility were worth considerably more than $150,000 and that they enjoyed a presumption against criminal condemnation.

The trial court announced that after reviewing the sworn written statements, it had come to the conclusion that the security, as exemplified by the exhibits, was "rendered valueless." On the worth of property attached, the trial court commented, "When we boil it down in essence the question of value really relates to the value of the books." Thus, it must be presumed

---

[16]There was considerable hearsay in this declaration as there was in other materials furnished all of which the trial court deprecated to some extent. Nonetheless, no serious objections were made, and it appears that the trial court took it all into consideration.

that it found against defendants on the value of garnishments and the worth of the office equipment and furnishings. Then, alluding to the "intangible factor . . . of the criminal proceedings" it found that the worth of the books at that particular point in time was "an indeterminate factor [it could not] . . . quite measure."

■ It denied "the motion to dissolve the [$150,000] attachment" but increased "pursuant to [Code of Civil Procedure section] 539 the undertaking of the last writ from $75,000 to $150,000."

Implicit in this order with respect to the issues listed *supra* was a determination that the defect in the affidavit (failure to allege that no act of plaintiff caused loss of security value) was curable and cured by evidence or amendment at the hearing; that there was no waiver of the requirement for an attachment undertaking or that plaintiff was estopped to assert it by having put up a bond in securing the first writ of attachment and a bond in half the amount of the writ in securing the second writ of attachment. ■ Implicit in finding that the security was "rendered valueless" is the concept that the security had some value when given and that it became valueless as such at the time the writ was obtained, making it unnecessary to reach issues 3 and 4.

■ The serious question is whether the evidence supports the finding, implied from the term "rendered valueless," that at least some of the security had value when given and had become valueless as such at the time the writ of attachment was applied for. It is enough that part of the security had value. (*Yosemite etc. Assn.* v. *Case-Swayne Co.,* 73 Cal.App.2d 806, 811-814 [167 P.2d 541]; see *Beaudry* v. *Vache,* 45 Cal. 3, 5.) The degree of worthlessness need only be that for security purposes. (*Williams* v. *Hahn,* 113 Cal. 475, 477 [45 P. 815].)

Some of the evidence went to the point that part of the security was of no value at the outset such as the copyrights and negatives of many books of which the suggested ownership by Miller could not be verified even as a possibility and the copyright to Defoe's book. However, some items were open to the inference of some initial value which dissipated to *de minimis* security value. Thus, the inchoate damage claim which became the subject of Miller Enterprises' lawsuit against Kable may have had some initial settlement value until Kable offsets, the subjects of its cross-claims, built up to outweighing proportions. The trial court also could have reasoned that the right of the Miller interests to reclaim books placed on consignment with Kable at the outset (which right could have been considered as an intangible under the comprehensive consignment) had value at first, but lost it when, as the attorney's declaration put it, thousands were given back. There were evidently copyrights and negatives of books, of which "Chaplin v. Chaplin"

was an example (some owned by Associated), with some but waning appeal because of staleness to begin with which lost it all from August 1965 to April 1968. There was the information from the bankruptcy proceeding of an inventory of unliquidated claims with no presently realizable value but upon which possible future recovery might be had. The inference is not too remote that if this were the case there would have been some value originally. Finally, although there was no explicit explanation by a witness, the inference is available that at the outset the account balance between Miller Enterprisees and Kable was favorable to Miller Enterprises when Kable sold some of the consigned books, and that then the making of advances by Kable to Miller Enterprises and the falling off of book sales turned the balance substantially the other way. In other words, originally there was an expectation of sales by Kable which did not materialize because market conditions were different than anticipated; so there was a depreciation of value to the Kable accounts from some on a speculative basis to none on an experience basis. Such evidence, although far from being explicit and robust, is not to be classified as insubstantial when all possible inferences and intendments are considered.

 As to the other issues: (1) We feel that the pleading-type of defect in the affidavit is not jurisdictional, should be attacked by a special appearance even in an ancillary proceeding, and can be cured by amendment. (1 Witkin, Cal. Procedure (1954) Jurisdiction, § 117, p. 381, and § 83, p. 351.) That plaintiff did not cause the dissipation in value of the security in any way becomes clear from the supporting documents filed by it in the second proceeding, and it can be presumed that the trial court considered them in the nature of amendments. In *Yosemite etc. Assn.* v. *Case-Swayne Co., supra,* 73 Cal.App.2d 806, cited by defendants, there appears to have been no curative pleading or supporting affidavit with respect to causation of loss of value. The court stated at page 814: ". . . [F]or aught that appears the plaintiff may have consented to the sales of canned fruit by the defendants, and thus waived its security." Moreover, although defendants' objection in *Yosemite* was on the ground that there was security, and that plaintiff had failed to aver that it had become valueless, the actual defect was more fundamental. At page 808 the court observed, "It did . . . aver . . . that the debt 'has not been secured by any mortgage or lien upon real or personal property.' " (2) There was not an excessive amount of property attached. With one minor exception,[17] the garnish-

[17]There is attached to the $150,000 writ as filed in the records of the superior court a return and answer to garnishment by a concern designated as "Bricks of California." (It is not certain as to whether this is the same as "Rick's.") The return is by the marshal of San Bernardino County dated May 31, 1968. The response of the garnishee was: "I am indebted to [Collectors and Millers] in the sum of $1,432,76 . . . and . . . have in my possession . . . paperback books in the amount of $804.33. $4,000." The return is dated June 7, 1968.

ments, essentially, had negative returns. The office equipment and furnishings were the subject of substantial third party claims. ■ The worth of the 2,200,000 books was a controversial question of fact for the trial court. Its decision of indeterminate value is supported by the evidence and should not be disturbed. (3 Witkin, Cal. Procedure (1954) Appeal, § 88, pp. 2251-2252.)

There was no appeal by plaintiff from the ruling that the undertaking should be increased from $75,000 to $150,000.

■ A final contention is made on appeal, based on *Sniadach* v. *Family Finance Corp.*, 395 U.S. 337 [23 L.Ed.2d 349, 89 S.Ct. 1820], that the remedy of attachment in suits of this nature is unconstitutional. The cited case is limited to wages. The situation in contracts such as sales of merchandise is not of constitutional dimension. If there is to be any change in the law, it should be implemented by the Legislature.

The order appealed from by defendants is affirmed.

Stephens, Acting P.J., and Aiso, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied October 1, 1970. Mosk, J., was of the opinion that the petition should be granted.