UNITED STATES of America,
Appellee,

v.

David LOPEZ, Appellant.

No. 179, Docket 33763.

United States Court of Appeals
Second Circuit.

Argued Sept. 29, 1969.

Decided Dec. 1, 1969.

**314**

Richard Ben-Veniste, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty., for the Southern District of New York, Elkan Abramowitz, Asst. U. S. Atty., of counsel), for appellee.

Louis Bender, New York City, for appellant.

Before FRIENDLY, SMITH and FEINBERG, Circuit Judges.

FRIENDLY, Circuit Judge:

David Lopez appeals from his conviction on four counts of an indictment after trial before Judge Mansfield and a jury in the District Court for the Southern District of New York.[1] Counts 76 and 77 charged that Lopez violated 26 U.S.C. § 7206(1) by stating in his 1960 and 1961 income tax returns that he had paid an estimated tax of $10,000 when he knew he had not. Counts 69 and 70 charged him with making false claims against the United States, in violation of 18 U.S.C. § 287, by depositing checks for income tax refunds for those years in the amount by which the tax reported to be due was less than the sum of the estimated tax allegedly paid and the taxes withheld. The court sentenced Lopez to 15 months imprisonment, running concurrently on all four counts, and fined him $10,000 each on counts 69 and 70 and $5,000 each on counts 76 and 77.

Lopez' crimes were alleged to have been committed in the course of a scheme whereby an employee of the Manhattan District Office of the Internal Revenue Service, Ethel Ivy Neely, and a former employee, Grover Cooper, would process fictitious or false income tax returns and secure refunds for the benefit of themselves or others. Mrs. Neely, the supervisor of the Math Verification Unit, testified that in April 1961, Cooper gave her Lopez' 1960 income tax return, which contained a figure of $10,000 opposite the words "Payments and credits on 1960 Declaration of Estimated Tax," told her the estimated tax claimed had not been paid, and instructed her to make sure the return was not audited. She assigned the return an account number, placed a large red "A" at the top, and forwarded it along with other returns for further processing, thus bypassing audit procedures. A year later the same performance occurred with respect to Lopez' 1961 return. For the supposed overpayments reported on his 1960 and 1961 returns, Lopez received refund checks of $6,643.57 and $2,556.11, which he endorsed and deposited in his bank account. It was stipulated that a search of the IRS index cards to ascertain whether Lopez had filed any estimated income tax returns for either year yielded negative results. An IRS employee testified he had likewise found no record of payments

---

1. The case is here for the second time, see United States v. Branker, 395 F.2d 881 (1968), cert. denied, 393 U.S. 1029, 89 S.Ct. 639, 21 L.Ed.2d 573 (1969); see also United States v. Branker, 418 F.2d 378 (2 Cir. 1969) (involving another defendant originally involved in this case).

in the Unidentified Accounts, where payments made without the filing of estimated tax returns would have been reflected. Kahn, an accountant who prepared Lopez' 1960 and 1961 tax returns, testified that he had also prepared estimated tax returns; in making out the final returns he assumed Lopez had filed these and had paid the estimated tax.

## I.

 Lopez mounts several contentions on the point that Counts 76 and 77 charged that the returns contained a statement that "the estimated federal income tax in the amount of $10,000 had been paid," whereas the returns read:

Payments and credits on Declaration of Estimated Tax $10,000.

Insofar as the argument is that the indictment did not charge the false statement actually made, there was at most an immaterial variance, which could not have prejudiced Lopez' defense since he knew full well what the returns had said. See Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); cf. Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). We likewise find no force in the claim that the Government did not meet its burden of proof by negating any credits. Kahn testified that he knew nothing about any credits and had advised Lopez to pay the first instalment of the estimated tax, and Lopez told two IRS inspectors that he had *paid* the estimated tax. This, together with the evidence that no declarations of estimated tax were filed, was enough for submission of the case to the jury. Contrast United States v. Fabric Garment Co., 262 F.2d 631 (2 Cir. 1958), cert. denied, 359 U.S. 989, 79 S.Ct. 1117, 3 L.Ed.2d 978 (1959). If Lopez had evidence of credits for prior years, it was open to him to present this. The same can be said in regard to Lopez' contention that the Government did not offer testimony directly establishing that the estimated taxes were not paid in the Brooklyn District where Lopez lived and had his place of business or at the Lawrence, Massachusetts, IRS service center.

## II.

Another set of arguments stems from an order of Judge Wyatt, who presided at the previous trial, granting a motion by Cooper for the suppression of evidence and the return of papers seized in the absence of a search warrant when he was arrested at his home. United States v. Bayley, 240 F.Supp. 649 (S.D.N.Y.1965). These included some material quite incriminating with respect to Lopez—an envelope bearing the printed name and address of Kahn and addressed to Lopez; Kahn's business card; a copy of a completed and executed 1959 income tax return making no claim of payments and credits on declaration of estimated tax; and an executed copy of a 1960 estimated tax declaration in the amount of $10,000. While the Government did not introduce any of these papers at the trial, Lopez asserts that it was this evidence that led to the investigation of his 1960 and 1961 returns and the refund checks for those years, to the inspectors' interrogation of Neely and Lopez, and to the testimony of Kahn. The Government makes two answers: (1) that its investigation of Lopez had an independent source in information volunteered by Neely, who was being questioned about other fraudulent returns after her arrest, and (2) that Lopez lacked standing with respect to the papers unlawfully seized at Cooper's home.

 Neely testified unequivocally that she had mentioned Lopez' name to the inspectors on her own; she was "positive" they did not mention the name to her first. Lopez says this is belied by the tape recording of the interview held on November 6, 1962. The Government concedes that the tape recording shows the suggestion as coming from one of the inspectors, but relies on Neely's testimony that she had mentioned the name before the taping began. The defense counters that this is inconsistent with the conversation at the beginning of the tape and with the inflection in Neely's

expression when Lopez' name was mentioned. Having listened to the tape in the presence of counsel, we would have tended to the defendant's view if we had presided at the trial. However, the facts are hardly clear enough to justify Lopez' claim that the Government knowingly allowed Neely to perjure herself in this regard. The question whether the Government's evidence came from an untainted source was a preliminary question of fact relating to admissibility and it would be only in the rarest instance that an appellate court would overturn a factual determination on that issue by the trial judge.

We need not debate whether this would be an appropriate case for doing so since the Government's alternative argument is well founded. In Alderman v. United States, 394 U.S. 165, 171, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969), the Court squarely faced the contention, saved for another day in Simmons v. United States, 390 U.S. 377, 390 n. 12, 88 S. Ct. 967, 974, 19 L.Ed.2d 1247 (1968), that "if evidence is inadmissible against one defendant or conspirator, because tainted by electronic surveillance illegal as to him, it is also inadmissible against his codefendant or coconspirator." This was rejected in the strongest terms, 394 U.S. at 171–172, 89 S.Ct. at 965, the Court saying:

> The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence. Coconspirators and codefendants have been accorded no special standing.

The Court relied heavily on the portion of Wong Sun v. United States, 371 U.S. 471, 492, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), upholding the admission against Wong Sun of the narcotics seized from Yee as a result of the illegal arrest of Toy, and on the formulation in Jones v. United States, 362 U.S. 257, 261, 80 S. Ct. 725, 4 L.Ed.2d 697, 78 A.L.R.2d 233 (1960), as we had done in United States v. Bozza, 365 F.2d 206, 222–223 (2 Cir. 1966). Thus the mere fact that Cooper was an alleged co-conspirator did not entitle Lopez to have the evidence suppressed.

Lopez further argues that he had a "possessory interest" in the property seized. While the trial judge did find that Lopez had owned the property at one time, the judge also noted that "he may well have given it to Cooper and kissed [it] goodbye, abandoned it." Lopez counters that there is no evidence to support this.[2] But even assuming Lopez met his burden of proof, still it does not follow that a "possessory interest" in goods seized from another's premises is sufficient in itself to entitle a defendant to suppression.

While Jones said that in cases where possession or ownership is an element of the offense the accused is charged with committing, "the possession on the basis of which [the accused] is to be * * * convicted suffices to give him standing," 362 U.S. at 264, 80 S.Ct. at 732, this must be read today in light of the Court's later ruling in Wong Sun, upholding admission against him of the narcotics unlawfully seized from Yee. The holding that the seizure "invaded no right of privacy of person or premises which would entitle Wong Sun to object to [the use of the narcotics gotten from Yee]

---

2. Relying on Jones, Lopez also contends that the Government should not be permitted to argue at the suppression hearing that Cooper did not hold the papers for Lopez and then argue at trial that Cooper acted on Lopez' behalf. Jones does rest in part on the notion that "squarely contradictory assertions of power by the Government," 362 U.S. at 264, 80 S.Ct. at 732, at a suppression hearing and at the trial should not be countenanced. However, it suffices for this case that the Government's positions were not "squarely contradictory"; the Government's assertion that Lopez relinquished the papers to Cooper is not inconsistent with its position at trial that Cooper acted on Lopez' behalf in having his returns processed.

at his trial," 371 U.S. at 492, 83 S.Ct. at 419, see also the distinction of *Jones* in n. 18, demonstrates that in such circumstances a possessory interest, even one sufficient for a conviction, is not enough in itself to require suppression. Since Lopez alleged this and nothing more, contrast United States v. Jeffers, 342 U.S. 48, 50, 72 S.Ct. 93, 96 L.Ed. 59 (1951), he could not have successfully objected to admission of the papers themselves if the Government had been able to retain them and in consequence he cannot complain of the introduction of their fruits.

■ The question whether Neely gave Lopez' name to the inspectors or they gave it to her appears again in an attack on the prosecutor's summation by the appellant. The theory urged in defense counsel's summation was that Lopez was completely innocent of any scheme involving Cooper and Neely, and that Neely had succumbed to the inspector's suggestions about Lopez in order to make a deal for herself and members of her family whose fraudulent claims she had processed. In responding to this the prosecutor not only relied on his version that Neely had volunteered the name to the inspectors, which was legitimate argument from the testimony even though as triers of the fact we would have found otherwise, but also made one or two remarks that could have been taken as asserting that the inspectors could not have come upon the name in any other way, which was not. On the other hand, the significance of the episode is much diminished as a result of our view concerning the admissibility of the fruits of the seizure. In that light the only effect of the misrepresentation was somewhat to weaken the defense case on what we regard as the immaterial issue whether the first mention of Lopez' name on November 8 was by Neely or the inspectors. While a conclusion by the jury favorable to the defense on that point might have aided its general assault on Neely's credibility, in light of the strength of the Government's case we cannot believe the re-

sult would have been different if these unfortunate remarks had not been made.

### III.

A third set of arguments stems from the dismissal of a count charging conspiracy at the first trial. In its broadest sense, the claim is that this should have wholly prevented the second trial since the substantive offenses of which Lopez stands convicted were committed as part of a conspiracy. See Sealfon v. United States, 332 U.S. 575, 68 S.Ct. 237, 92 L. Ed. 180 (1948). A narrower version is that the dismissal required exclusion of Neely's testimony of what Cooper had told her. Neither is well founded.

■■ As is made clear by the Supreme Court's opinion in *Sealfon, supra,* 332 U.S. at 578–579, 68 S.Ct. 237, and ours in United States v. Kramer, 289 F.2d 909, 913 (2 Cir. 1961), invocation of a prior judgment as collateral estoppel in a criminal trial requires the court to determine exactly what the earlier judgment decided. Judge Mansfield examined the record of the first trial and found that Judge Wyatt had dismissed the conspiracy count solely because he thought the record established several independent conspiracies rather than the single one charged, and not at all because of a belief that no conspiracy among Cooper, Neely and Lopez had been established. Indeed he thought this might very well have been done.

### IV.

■ Our holding that the dismissal of the conspiracy charge at the first trial did not require exclusion of Neely's testimony about statements by Cooper that would otherwise be barred by the hearsay rule does not, of course, lead to the conclusion that the statements were rightly received. In determining whether to admit such evidence, the standard to be applied in reviewing the trial judge, as we recently held in United States v. Geaney, 417 F.2d 1116 (1969), is whether the proof other than the hearsay declarations afforded reasonable grounds to find

that the defendant participated in a common venture with the declarant.

It is useful to delimit the problem by determining just what part of Neely's testimony is at issue. We set forth in full in the margin her testimony concerning the 1960[3] and the 1961[4] returns. When this is analyzed, it becomes apparent that the only portions raising hearsay problems are Cooper's declarations that the tax had not been paid and that Lopez' account had been transferred into the Manhattan District from Newark. Cooper's possession of the returns, his delivery of them to Neely and his instructions what to do with them were not within the ambit of the hearsay rule, although they would not have been a sufficient indication of defendant's guilt to warrant submission to the jury if they stood alone. See United States v. Costello, 352 F.2d 848, 853–854 (2 Cir. 1965), rev'd on another ground sub nom., Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); United States v. Markis, 352 F.2d 860, 863–864 (2 Cir. 1965), rev'd on another ground, 387 U.S. 425, 87 S.Ct. 1709, 18 L.Ed.2d 864 (1967); United States v. Nuccio, 373 F.2d 168, 173 (2 Cir.), cert. denied, 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623 (1967); United States v. Branker, 418 F.2d 378 (2 Cir. 1969); United States v. Tyminski, 418 F.2d 1060 (2 Cir. 1969).

■ The independent proof showing a link between Lopez and Cooper began with Kahn's testimony that he was introduced "indirectly through Mr. Lopez" to Cooper. This gained some added significance through Lopez' denial to the IRS inspectors that he had ever known Cooper. More important were Cooper's possession of Lopez' tax returns long after Cooper had left the IRS, his instruction to Neely, the resulting issuance of refund checks and Lopez' endorsing and depositing them in his bank account. While it is admittedly difficult to free our minds from the influence of other circumstances, such as the evidence adduced at the first trial but not at the second with respect to Cooper's efforts to have Lopez' delinquent accounts transferred from the Newark to the Manhattan office so that he could destroy them, see 395 F.2d at 886–887, and the Lopez papers seized at Cooper's home, the independent proof of Lopez' conspiring with Cooper met the *Geaney* test.

## V.

■ Although a number of other points have been raised and considered, the only one meriting mention is the claim that the interrogation of Lopez at his home by two IRS inspectors was in violation of Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed. 977 (1964)— the standard here applicable since Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966), was not decided until after Lopez' first trial although before his second. See Jenkins v. Delaware, 395 U.S. 213, 89 S.Ct. 1677, 23 L.Ed.2d 253 (1969). The asserted violation is that although Lopez answered most of the questions freely he stated on a few occasions "I would like to speak to my attorney before answering that question." The inspectors respected his desires; indeed, shortly before leaving, they wrote down several questions for him to discuss with his law-

3. "He [Cooper] told me that Mr. Lopez' account had been transferred into the Manhattan District from Newark, and he told me that he wanted me to process the returns. He said that the amounts that's claimed for the estimated tax credit was not paid, that I should put through the return so that it would not receive an audit and so that the estimated credit couldn't be checked and the large amount would be—the large refund would look like it was an accepted refund."

4. "He [Cooper] told me here again was estimated tax credits that were claimed on the return that were not paid. He told me to be sure that this return was not audited. It also had a large refund on it, and he also wanted the return to appear that it had been through the classification section. And he just stressed the point that the return should never be audited."

yer and Lopez stated he would contact them later. While Lopez' argument would very likely fail even if he had been in custody, see Frazier v. Cupp, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), we need not consider that. The complete absence of any coercive atmosphere renders *Escobedo* inapplicable, as we have held in United States v. Squeri, 398 F.2d 785, 790 (2 Cir. 1968); United States v. Mackiewicz, 401 F.2d 219 (2 Cir. 1968); and other cases. See also the many decisions to the same effect collected in Cohen v. United States, 405 F.2d 34 (8 Cir. 1968), cert. denied, 394 U.S. 943, 89 S.Ct. 1274, 22 L.Ed.2d 478 (1969).

Affirmed.