UNITED STATES of America, Appellee,

v.

Marvin MILLER, Appellant.

No. 75–3016.

United States Court of Appeals,
Ninth Circuit.

Nov. 10, 1976.

Richard Trattner (argued), of Trattner & Pastor, Beverly Hills, Cal., for appellant.

Julian S. Greenspun, Asst. U. S. Atty. (argued), Los Angeles, Cal., for appellee.

Before BARNES and ELY, Circuit Judges, and VAN PELT,* District Judge.

BARNES, Senior Circuit Judge:

This is an appeal from appellant's conviction on 22 counts of a 24-count indictment charging tax evasion (26 U.S.C. § 7201),

* The Honorable Robert Van Pelt, Senior Judge, District of Nebraska, sitting by designation.

making and subscribing false tax returns (26 U.S.C. § 7206(1)), mail fraud (18 U.S.C. § 1341), and filing false claims against the United States (18 U.S.C. § 287).[1]

1. The twenty-four counts were:

| Count | Code Section | Offense |
|---|---|---|
| A. | 18 U.S.C. § 1341 (Mail Fraud) | The use of the U.S. Postal Service to send and deliver the following false returns. |
| 1 | " | Miller's personal U.S. Tax return for 1969. |
| 2 | " | Mrs. Miller's personal U.S. tax return for 1969. |
| 3 | " | Covina's corporate U.S. Tax return for the fiscal year ending May 31, 1970. |
| 4 | " | Millers' joint U.S. tax return for 1970. |
| 5 | " | Miller's personal California state tax return for 1970. |
| 6 | " | Mrs. Miller's personal California state tax return for 1970. |
| 7 | " | Millers' amended joint personal U.S. tax return for 1970. |
| B. | 26 U.S.C. § 7201 (Tax Evasion) | Pursuant to a willful attempt to evade taxes, the preparation and filing of the following false returns: |
| 8 | " | Covina's corporate tax return for the fiscal year ending May 31, 1969. |
| 11 | " | Miller's personal U.S. tax return for 1968. |
| 13 | " | Mrs. Miller's personal U.S. tax return for 1968. |
| 15 | " | Miller's personal U.S. return for 1969. |
| 18 | " | Mrs. Miller's personal U.S. tax return for 1969. |
| 21 | " | Millers' joint U.S. tax return for 1970. |
| C. | 26 U.S.C. § 7206(1) Subscribing a False Tax Return | Signing and/or preparing a fraudulent return for: |
| 9 | " | Covina for the fiscal year ending May 31, 1970. |
| 10 | " | Covina's tax return for fiscal year ending May 31, 1970. |
| 12 | " | Miller's personal U.S. tax return for 1968. |
| 14 | " | Mrs. Miller's personal U.S. tax return for 1968. |
| 16 | " | Miller's personal U.S. tax return for 1969. |
| 22 | " | Millers' joint U.S. tax return for 1970. |

During the period of January 1, 1968, through June 1, 1970, Miller operated Covina Publications, Inc. ("Covina") and two related companies. The primary business of Covina was the sale of adult books, films and devices to the general public by mail order and to wholesale distributors. Miller dominated and controlled Covina, for which he received a set salary. He purchased all issued stock of the corporation for $128,200.00, which stock was held in the names of his four children, and (perhaps) his wife.[2]

In the course of the trial, it was not disputed that for the fiscal year ending May 31, 1969, approximately $562,000.00 of mail order and distributors receipts were not recorded as sales on the corporate books, or reported in the corporate tax returns filed by Miller. About $298,000.00 was likewise omitted as sales from the books and tax returns for the fiscal year ending May 31, 1970. Such sums were instead recorded either as loans from the defendant and from banks to the corporations, as payments on account from various wholesale customers, or as "exchanges" (intercompany transfers). Evidence submitted by the government indicated that most of the money was deposited in various business and personal bank and savings accounts established by Miller under various names including those of his wife and children.

During the same period (5/31/68 to 5/31/70) Miller received, in addition to his salary, other economic benefits from Covina, the latter making periodic checks to Miller and paying virtually all of his personal bills (from the mortgage on his home to his "Book-of-the-Month" Club obligations). The total of such payments was in excess of $197,000.00 which was recorded on Covina's books as repayments of loans. Miller did not report any of the money on his own, or his wife's two years of separate, and one year of joint, returns. (Calendar years 1968, 1969, and 1970).

For the fiscal years considered herein, Miller asserted that Covina had been a losing venture. In the year ending May 31, 1969, Covina reported a net loss of approxi-

Note 1—Continued

| Count | Code Section | Offense |
|---|---|---|
| C. | 26 U.S.C. § 7206(1) Subscribing a False Tax Return | Signing and/or preparing a fraudulent return for: |
| 24 | " | Millers' amended joint U.S. tax return for 1970. |
| D. | 18 U.S.C. § 287 Filing a False Claim against the United States | The claim for a refund for overpayment of taxes incorporated in: |
| 17 | " | Miller's personal U.S. tax return for 1969. |
| 20 | " | Mrs. Miller's personal U.S. tax return for 1969 which included a claim for a refund. |
| 23 | " | Millers' joint U.S. tax return for 1970 which included a claim for a refund. |
| 25 | " | Millers' amended joint U.S. tax return for 1970 which included an additional claim for refund. |

E. No Count 19 was ever listed

The government dismissed count 3. The defendant was found not guilty on count 8.

2. At the trial, appellant stated his four children and William Miller were the stockholders, but that he was the real owner and operator of the business. (R.T., p. 1120) In his brief, appellant alleges "the nominal ownership of his corporations was in the name of his wife and children." (Appellant's Brief, pp. 11–12).

mately $216,000.00. At trial, an expert witness for the defendant argued that due to an erroneous entry into the books of a sale of a mailing list for $500,000.00, which was never consummated, the loss for the year should have been reported as $681,000.00. Likewise, for the fiscal year ending May 31, 1970, Covina reported a loss of $697,000.00. The Internal Revenue Service commenced an audit of the books of the defendant's companies in 1971.

At trial, Miller admitted that he had instructed his accountant to "scramble" the corporate books. However (for what such a self-serving statement is worth), he later testified that the sole purpose of all of his concealment activities was to hide his income from his creditors and not to cheat the government.[3] Miller stated that he had instructed his accountant to keep track of the real figures and file proper returns. Miller also asserted (for what it is worth) that he signed and filed the returns without really studying them, relying instead on his accountant's alleged assurances that "everything is okay."

At the close of the trial, one count of mail fraud (count 3) was dismissed upon the motion of the government. The trial judge found Miller not guilty of count 8 (tax evasion based on Covina's 1969 tax return). While there was evidence that Covina's tax return for the 1969 fiscal year was fraudulent, there was insufficient evidence to prove beyond a reasonable doubt that there would have been any tax due for that year (even if the $562,000.00 was added to Covina's income), due to the fact that the $500,000.00 sale was never shown to have occurred during the year.[4] Miller was found guilty on all the remaining counts.

On appeal, Miller raises an extremely technical argument. He asserts that the $197,000.00 he received from Covina *must* be treated as a constructive corporate distribution to a shareholder and be governed by §§ 301(c) and 316(a) of the Internal Revenue Code ("I.R.C.")[5] As Covina was not shown to have had any earnings and profits during the period under consideration, Miller argues that the $197,000.00 represented primarily a return of capital[6] and hence the distribution had no substantial tax consequences.[7] Consequent-

---

**3.** Covina was subject to a series of prejudgment attachments which culminated in 1971 when the attaching creditor obtained a judgment, with costs, in excess of one million dollars. *See* in this regard, *Western Bd. of Adjustors, Inc. v. Covina Pub. Inc.*, 9 Cal.App.3d 659, 88 Cal.Rptr. 293 (1970).

**4.** It was demonstrated at trial that even if the $298,000.00 of diverted income were actually added to Covina's 1970 tax return, no tax liability would have resulted due to corporate losses of over $516,000.00 for that year.

**5.** According to I.R.C. § 316(a), a distribution of property by a corporation to its shareholders constitutes a dividend to the extent it is made out of earnings and profits of the corporation. I.R.C. § 301(c) provides that any distribution of property made by a corporation to a shareholder with respect to its stock shall be treated as a dividend if the distribution comports with the definition set out in I.R.C. § 316(a), and shall be included in gross income. Insofar as a portion of the distribution is not covered by earnings and profits, it is to be treated as a return of capital and the basis for the stock is reduced accordingly. If the distribution exceeds the adjusted basis of the stock, the excess is normally considered as capital gain. I.R.C. § 301(c)(3).

**6.** Dividends are classified as gross income. I.R.C. §§ 301(c)(1) and 61(a)(7). A return of capital is normally not a taxable event. Capital gains treatment may produce tax obligations. *See*, I.R.C. § 1201.

**7.** However, Miller's expert witness testified that the basis for Miller's stock in Covina was only $128,200.00 (R.T., p. 1196). Consequently, $68,800.00 of the $197,000.00 would have been subject to capital gains treatment. According to Miller's calculations, given his claims of capital losses, he concluded that ultimately he owed taxes only for a long term capital gain of $1,699.00 for 1970.

It is noted herein that even if Miller's constructive distribution theory were accepted, Miller could nevertheless be convicted on several of the counts so long as his intent to falsify his return is found. *See* discussion of 26 U.S.C. § 7206(1) in footnote 8, *infra*. As an example, Miller's own conclusion was that he had tax liability for a long term capital gain of $1,699.00 for 1970. That amount is substantial enough to constitute a violation of 26 U.S.C. § 7201, especially when considered in light of the claim for a tax refund of more than $4,000.00 which he made that year and which was later increased by an additional $210.00

ly, he suggests that his signing and filing of his own and his wife's separate and joint tax returns and his use of the United States Postal Service to deliver them do not violate any statutory provisions. Because the trial court did not specifically find that Covina owed any additional taxes, even if the omitted income were added to the calculations for the years in question, and because the $197,000.00 is alleged to be not taxable to him, Miller further argues that there is insufficient evidence to establish that he intentionally filed false corporate returns for Covina.[8]

ISSUES:

(1) Was the $197,000.00 diverted by Miller gross income to him or a form of constructive corporate distribution?

(2) Is there substantial evidence to support Miller's conviction on the various counts?

■ This case raises the primary problem of characterizing, for the purposes of *criminal* tax proceedings, the nature of funds diverted by a taxpayer from his close corporation. Normally, such categorization is relatively unimportant in criminal cases

since the primary question is not the amount of the evasion but whether the taxpayer intended to evade and defeat his taxes. *Goldberg v. United States*, 330 F.2d 30, 40 (3rd Cir.), *cert. denied*, 377 U.S. 953, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964); *Simon v. C.I.R.*, 248 F.2d 869, 876 (8th Cir. 1957); *Drybrough v. C.I.R.*, 238 F.2d 735, 737 (6th Cir. 1956). *See also*, Gardner, The Tax Consequences of Shareholder Diversions in Close Corporations, 21 Tax L.Rev. 223, 226–27 (1966). Such diverted funds are typically considered as constructive corporate distributions and classified as dividends pursuant to I.R.C. §§ 301(c) and 316(a). *See, e. g.*, *O'Rourke v. United States*, 347 F.2d 124, 127 (9th Cir. 1965). Because dividends are includable in gross income, I.R.C. § 61(a)(7), the end result is a conclusion that the diverted funds constitute income to the taxpayer which he must report or be held to have evaded his tax obligations. *O'Rourke, supra*, 347 F.2d at 127–28; *Hartman v. United States*, 245 F.2d 349, 352–53 (8th Cir. 1957). However, where, as here, there are no corporate earnings and profits from which a dividend could be paid, the classification of the diverted funds becomes more critical.[9] If the corporation has no earnings

---

when he filed an amended 1970 return. *See, Marks v. United States*, 391 F.2d 210, 211 (9th Cir. 1968) (where the taxpayer was convicted for cheating on his tax return for failure to report a total net taxable income of $1,877.43 for which the tax would have been $375.49). As Miller's willful and intentional efforts to evade his taxes is well documented in the record (an aspect which the defendant's briefs do not adequately attempt to dispel), Miller's technical arguments are not persuasive.

8.  Miller contends that because the trial court found no tax obligation for Covina for 1969 and none was asserted for 1970 even if the diverted receipts were added to the calculations for those years (*see* footnote 4 and concomitant text), he therefore had no motive to file false corporate returns for Covina. However, two theories refute that contention. First, the concealment of the corporate receipts was a necessary element to their diversion for his own personal use. It follows that in order to hide their withdrawal by him, Miller had concealed their real nature as income to the corporation. Secondly, it is well established that under 26 U.S.C. § 7206(1) it is not the evasion of taxes which is the prohibited offense but the falsification of tax statements. *United States*

*v. Bishop*, 412 U.S. 346, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973); *Cf., Edwards v. United States*, 375 F.2d 862, 865 (9th Cir. 1967). That the falsity may not relate to the computation of the correct tax liability is not a determining factor. *Siravo v. United States*, 377 F.2d 469, 472 (1st Cir. 1972); *Cf. United States v. Abbas*, 504 F.2d 123, 126 (9th Cir. 1974), *cert. denied*, 421 U.S. 988, 95 S.Ct. 1990, 44 L.Ed.2d 477 (1975). Here, Miller knew that he had diverted over $750,000.00 in corporate income. Even if such diversion had no immediate tax consequences, Miller was nevertheless obligated to report such receipts to the government.

9.  It was argued by Miller that because Covina's losses for its 1969 and 1970 fiscal years so far exceeded its income (even if the diverted funds are included in the calculations), such losses precluded the possibility of any earnings and profits for those years. However, due to the fact that Miller ordered the corporate books to be "scrambled," the trial judge concluded that no showing of an absence of earnings and profits could be obtained by an examination of the books. As to Miller's arguments as to the adequacy of the books, *see* footnote 13, *infra*.

and profits and if the taxpayer's cost basis of the stock exceeds the amount of the diverted funds, the application of the constructive distribution rules as urged by appellant would permit the taxpayer to escape conviction by enabling him to assert that the diverted funds were a constructive return of capital and hence non-taxable as income.

Defendant Miller contends that the trial court has committed reversible error as to all of the counts due to its initial characterization of the $197,000.00 in direct and indirect payments to him as salary rather than constructive corporate distributions. While Miller's contention raises some interesting questions as to the extent of wrongdoing required to sustain convictions for tax evasion (26 U.S.C. § 7201), subscribing false tax returns (26 U.S.C. § 7206(1)), filing false claims against the United States (18 U.S.C. § 287) and mail fraud (18 U.S.C. § 1341), such questions need not be considered if the conclusion is reached that the trial court was not in error in its initial

characterization.[10] Consequently, those issues are not dealt with herein because the trial court's characterization is not in error.

As support for his argument that funds diverted by a taxpayer from his close corporation must be treated as constructive distributions, Miller basically argues that most courts have traditionally applied such a rule and to do otherwise in the present situation would lead to various inconsistencies in the tax law. Several *civil* tax decisions are cited. *E. g.*, *Noble v. C.I.R.*, 368 F.2d 439, 442 (9th Cir. 1966); *DiZenzo v. C.I.R.*, 348 F.2d 122, 126 (2nd Cir. 1965); *Clark v. C.I.R.*, 266 F.2d 698, 707 (9th Cir. 1959); *Simon, supra.*

Conversely, the government argues that the diverted funds must be treated as income to the taxpayers without regard to any tangential factors such as earnings and profits of the corporation. The government primarily relies on *Davis v. United States*, 226 F.2d 331 (6th Cir. 1955), *cert. denied*, 350 U.S. 965, 76 S.Ct. 432, 100 L.Ed.2d 838 (1956). In *Davis*, a *criminal* tax proceeding,

10. To sustain a conviction for tax evasion, 26 U.S.C. § 7201, it must be shown that the defendant willfully attempted to evade the tax, that there was a tax deficiency, and that the defendant committed some affirmative act to that end, *Sansone v. United States*, 380 U.S. 343, 351, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965), *O'Rourke v. United States*, 347 F.2d 124, 126 (9th Cir. 1965). A violation of 26 U.S.C. § 7206(1) is complete when the taxpayer files a return "which he does not believe to be true and correct as to every material matter." *United States v. Bishop*, 412 U.S. 346, 350, 93 S.Ct. 2008, 2012, 36 L.Ed.2d 941 (1973). That the falsity does not directly relate to the calculation of the correct tax liability does not necessarily affect its materiality. *United States v. Abbas*, 504 F.2d 123, 126 (9th Cir. 1974), *cert. denied*, 421 U.S. 988, 95 S.Ct. 1990, 44 L.Ed.2d 477 (1975); *United States v. Edwards*, 375 F.2d 862, 865 (9th Cir. 1967). Mail fraud, 18 U.S.C. § 1341, necessitates a scheme to defraud and the mailing of a letter for the purpose of executing the scheme. *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954). The filing of a false tax return pursuant to a scheme to obtain an unjustified tax refund is sufficient to establish a violation of presenting a false claim against the United States under 18 U.S.C. § 287. *United States v. Lopez*, 420 F.2d 313 (2nd Cir. 1969); *Kercher v. United States*, 409 F.2d 814 (8th Cir. 1969).

Insofar as any of the above offenses require an intent to evade taxes (which in this case is equivalent to an intent to defraud the government, especially when Miller is faced by his claims for tax refunds). That requisite element is sufficiently demonstrated in the record. However, insofar as those offenses require additional elements, the problem arises. If Miller's argument as to constructive corporate distributions were adopted, the situation would arise where Miller would be found: (1) to have willfully attempted to evade his tax obligations by hiding the diverted funds as non-taxable repayments of loans, (2) to have engaged in activities necessary to complete his scheme, *e. g.*, signing and mailing his presumed false returns, (3) but, due to the after-the-fact categorization of the diverted funds as returns of capital, not to have had taxable income for at least some of the years in question. (The $197,000.00 payments were spread over the three year period from 1968 to 1970. To the extent that they would have exceeded Miller's $128,200.00 basis in the stock, such excess payments would have occurred initially in the latter part of 1969 and in 1970.) Consequently, questions would arise as to whether Miller could be convicted of 26 U.S.C. § 7201, which has been interpreted as requiring a tax deficiency to be present, or of 18 U.S.C. §§ 287 and 1341.

it was held that where the taxpayer diverted for his own use the income of a wholly-owned corporation, such income was taxable to him irrespective of whether the corporation had sufficient surplus to make the distribution as a dividend. In so holding, the court stated that:

"Appellant contends in this case that, whether the cash which he took from his wholly owned corporation was a "taxable gain," depends upon whether the corporation had sufficient surplus to cover a dividend distribution, as otherwise there would be no way in which he could receive such cash as a gain taxable to him and, since there is no proof of such a surplus, he is only a holder of the cash for the benefit of the corporation. However, it does not make any difference whether he received it as a legal distribution of cash as the result of a dividend, or whether he took it fraudulently, using his wholly owned corporation with its false bookkeeping methods and concealment of sales and receipts to hide the fact that he was secretly acquiring from this source of cash, over which he exercised command, control, and dominion, and from which he realized economic gain and benefit. For "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid." *Corliss v. Bowers*, 281 U.S. 376, 378, 50 S.Ct. 336, 74 L.Ed. 916. It is the command over property and the enjoyment of its economic benefit which are recognized as a proper basis for taxation. *Burnet v. Wells*, 289 U.S. 670, 53 S.Ct. 761, 77 L.Ed. 1439; *Helvering v. Horst*, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75. It is not necessary to go into the legality of the so-called distribution by appellant's wholly owned corporation to himself, or his extraction of the cash from the corporation, as it clearly appears that through the fraudulent transactions in which he was engaged, he received the cash over which he had complete control, which he took as his own, treated as his own, which resulted in economic value to him, and for which he probably never would have been required to account, had it not been for the discovery of the fraud on the revenue which he was perpetrating. *Briggs v. United States*, 4 Cir., 214 F.2d 699." *Davis, supra*, 226 F.2d at 334-35.

■ *Davis* has been generally followed in the review of *criminal* tax proceedings by the circuit courts. *Goldberg, supra*, 330 F.2d at 40 (3rd Cir.); *Hartman, supra*, 245 F.2d at 352-53 (8th Cir.), *and see* also Lofts and Lofts, 285 T.M., Tax Crimes—Evasion of Another's Tax and Defenses, p. A–5 (1973). *But see, Bernstein v. United States*, 234 F.2d 475 (5th Cir.), *cert. denied*, 352 U.S. 915, 77 S.Ct. 213, 1 L.Ed.2d 122 (1956). And, at least two circuits have refused to follow *Davis* in the context of *civil* tax proceedings. *DiZenzo, supra*, 348 F.2d at 126 (2nd Cir.); *Simon, supra*, 248 F.2d at 876 (8th Cir.).[11]

11. Appellant (after all briefs were filed, but prior to argument) cited the case of *United States v. Leonard*, 524 F.2d 1076 (2nd Cir. 1975), *cert. den.*, 425 U.S. 958, 96 S.Ct. 1737, 48 L.Ed.2d 202, 1976 to demonstrate that the Second Circuit has rejected the holding of *United States v. Davis, supra*, and is now willing to apply the standard set out in the civil tax fraud case of *DiZenzo v. C.I.R., supra*, which requires that funds diverted by a shareholder from his wholly-owned corporation should be treated as corporate distributions rather than as ordinary income.

The support which *Leonard* provides the appellant's contention is difficult to determine, and is most certainly a weak reed. In *Leonard*, the defendant had formed a corporation to which he transferred the business of his sole proprietorship. He continued to cash several of the checks received by him after the formation of the corporation to his own account even though they belonged to the corporation at that point. The government contended that the funds were embezzled income. The defendant argued that under *DiZenzo* the funds were to be treated as constructive dividends. The court stated that: "Acceptance of this [defendant's argument] still does Leonard no good unless, as he asserts, Leonard, Inc. had no earnings or profits . . .." *Leonard, supra*, 524 F.2d at 1083. The court went on to hold that once the government has established that the defendant had received unreported funds the burden of proof to demonstrate that the funds were constructive dividends rather then embezzled funds shifted to the defendant.

"In prosecutions for income tax violations, production of a rather slight amount of evi-

■ This court must decide whether the rules of constructive distribution are to be automatically applied in the present situation, a review of a *criminal* tax proceeding. In civil tax cases the purpose is tax collection and the key issue is the establishment of the amount of tax owed by the taxpayer. In a criminal tax proceeding the concern is not over the type or the specific amount of the tax which the defendant has evaded, but whether he has willfully attempted to evade the payment or assessment of a tax. *Goldberg, supra,* 330 F.2d at 40; *Simon, supra,* 248 F.2d at 876.

■ The difficulty in *automatically* applying the constructive distribution rules to this case is that it completely ignores one essential element of the crime charged: the willful intent to evade taxes, and concentrates solely on the issue of the nature of the funds diverted. That latter aspect is not the important element. Where the taxpayer has sought to conceal income by filing a false return, he has violated the tax evasion statutes. It does not matter that that amount could have somehow been made non-taxable if the taxpayer had pro-

ceeded on a different course.[12] To apply the constructive distribution rules to this situation would nullify all of the taxpayer's prior unlawful acts.

■ If constructive distribution rules were automatically applied, an anomalous situation would result. A taxpayer who diverted funds from his close corporation when it was in the midst of financial difficulty and had no earnings and profits would be immune from punishment (to the extent of his basis in the stock) for failure to report such sums as income; while that very same taxpayer would be convicted if the corporation had experienced a successful year and had earnings and profits. Such a result would constitute an extreme example of form over substance. In addition, it would sanction the diversion and non-reporting of corporate and personal funds, contrary to the intent and express language of the statutes. We therefore conclude that whether diverted funds constitute constructive corporate distributions depends on the factual circumstances involved in each case under consideration.

dence by the Government, here the proof of receipt of what are charitably characterized as constructive dividends rather than embezzled funds, may transfer the burden of going forward to the defendant. . . ." *Id.* citing *Holland v. United States,* 348 U.S. 121, 137–139, 75 S.Ct. 127, 99 L.Ed. 150 (1954). It was concluded that the defendant failed to introduce sufficient evidence of an absence of earnings and profits to even warrant consideration by the jury of the defendant's contention that the diverted funds were returns of capital and hence non-taxable. Defendant's conviction was affirmed on two counts of violating § 7206(1) of 26 U.S.C. (I.R.C.1954), "Subscribing a False Tax Return"; which counts are similar to counts 9, 12, 14, 16, 22 and 24 in this case.

*Leonard* is not particularly helpful to appellant herein. First, the Second Circuit in *Leonard* relied on a civil tax fraud case for support of the proposition that the diverted checks were to be treated as constructive distributions. As discussed in this opinion, such reliance in a criminal tax fraud case is not well founded. Second, the court in *Leonard* did not categorically accept the defendant's proposition that *DiZenzo* had to be applied but rather noted that even if it were to accept the defendant's contention, the defendant nevertheless

failed to demonstrate a lack of earnings and profits so as to fall within his own theory. Third, in *Leonard,* the burden of going forward is said to be transferred to the defendant once the government establishes that he has received unreported funds. In the present case, the appellant argued that the government must show that there were no earnings and profits. According to *Leonard,* he is mistaken in that contention. The trial court here found that the corporate books were so confused that a determination as to the presence or absence of earnings and profits could not be made. Consequently, even if *Leonard* were applicable, it would not support a reversal of the appellant's conviction on the false tax return counts.

12. At the time the funds are initially diverted, it might well be argued that they could constitute either income or a return of capital. However, once the taxpayer has assumed control of the funds and then fails to report such funds as income or to make any adjustments in the corporate books to reflect a return of capital, he has already violated the tax evasion statutes. *Accord, Spies v. United States,* 317 U.S. 492, 498–99, 63 S.Ct. 364, 87 L.Ed. 418 (1943); *United States v. Swallow,* 511 F.2d 514, 521 (10th Cir.), *cert. denied,* 423 U.S. 845, 96 S.Ct. 82, 46 L.Ed.2d 66 (1975).

■ In holding that the constructive distribution rules should not automatically be applied, it is not herein asserted that diverted funds could never be a return of capital. However, to constitute the latter, there must be some demonstration on the part of the taxpayer and/or the corporation that such distributions were intended to be such a return.[13] To hold otherwise would be to permit the taxpayer to divert such funds and if not caught, to later pay out another return of capital; or if caught, to avoid conviction by raising the defense that the sums were a return of capital and hence non-taxable.

■ In considering the trial judge's determination that the $197,000.00 constituted additional salary, it is noted that, on appeal of a conviction in a criminal case, the evidence must be considered in a light most favorable to upholding the verdict (in this case for the government) and the findings of a trial judge cannot be set aside unless clearly erroneous. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Glover*, 514 F.2d 390, 391 (9th Cir. 1975); *United States v. Hood*, 493 F.2d 677, 680 (9th Cir.), *cert. denied*, 419 U.S. 852, 95 S.Ct. 94, 42 L.Ed.2d 84 (1974).

■ Several factors were presented which support the conclusion that the $197,-000.00 can be considered as additional salary. *First*, Miller admitted that he himself was not a shareholder but that the shares were in his children's names. Consequently, the only capacity in which Miller was entitled to receive the diverted funds was as an employee-officer of the corporation. While there are cases wherein the receipt of distributions from the corporation by a relative of the shareholder is considered to be a constructive distribution, *see e. g., Harry L. Epstein*, 53 T.C. 459 (1970), such cases are civil tax proceedings. As discussed above, the application of theories established in civil tax cases to problems in criminal tax cases cannot always be made. Where the taxpayer creates and uses a corporation, he cannot readily expect a court to disregard the situation which he has created when it becomes inconvenient for him. *Cf. Harrison Property Management Co., Inc. v. United States*, 475 F.2d 623, 626–27, 201 Ct.Cl. 77 (1973), *cert. denied*, 414 U.S. 1130, 94 S.Ct. 868, 38 L.Ed.2d 754 (1974).

■ *Second*, Miller has admitted that he ordered the "scrambling" of the corporate books so that one cannot tell from the records exactly what the payments were intended to be. When the taxpayer has by his own wrongful actions created a situation where certain payments are open to several interpretations, he cannot complain if the conclusion of the trier-of-fact differs from his own, if there is a reasonable factual basis for the decision.[14]

■ *Third*, at trial, Miller presented no concrete proof that the amounts were considered, intended, or recorded on the corporate records as a return of capital at the time they were made. In fact, the payments were recorded as "repayments of loans," which were shown later to be non-

---

**13.** The government establishes a *prima facie* case when it demonstrates that the taxpayer had unexplained funds which could be considered as income which the taxpayer fails to report in his return. *United States v. Garcia*, 412 F.2d 999, 1001 (10th Cir. 1969); *Gendelman v. United States*, 191 F.2d 993, 996 (9th Cir. 1951), *cert. denied*, 342 U.S. 909, 72 S.Ct. 302, 96 L.Ed.2d 680 (1952).

**14.** Miller argues that his expert witness had no difficulty in reading the corporate books. However, the expert witness merely testified that from his study of the books he concluded that Covina had no earnings and profits.

From that initial conclusion (which is contrary to that of the government's witness), he made the quantum leap that the distributions therefore had to be returns of capital. As discussed above, that syllogism is not necessarily correct. Nowhere in his testimony does the expert witness give examples that the payments were ever intended to be, or recorded in the corporate books at the time they were made as returns of capital. Alternatively, it is also noted that the trial court need not have accepted the expert witness's statements as being correct, especially in light of contrary testimony by the government's expert witness.

existent and false. Such an effort to disguise an allegedly non-taxable event (which a return of capital would normally be) raises doubts as to any claim by the defendant that he considered them to be a return of capital.[15]

Finally, the trial judge found Miller's set salary to be too small for the years in question. The judge noted Miller's responsibilities and control of the corporation and the amount and volume of business which it did. The conclusion that Miller's set salary was too small, so that the $197,000.00 could be considered as additional salary, is not clearly erroneous.

Miller in his brief before this Court states that the "almost exclusive issue on appeal" is the question of the treatment of the diverted funds to him. Appellant's Reply Brief, p. 1. That assessment is essentially correct.

▮▮▮▮▮▮ We agree with the trial court's holding that the $197,000.00 of diverted funds constituted additional salary to the defendant. As to the other counts, there was substantial evidence to demonstrate (1) that Miller sought to evade the payment of taxes in violation of 26 U.S.C. § 7201 on said funds, as well as on the other sums which he diverted from Covina; (2) that pursuant to such evasion, Miller caused to be prepared and subscribed false returns for Covina, his wife and himself, and the latter two's joint tax return as proscribed by 26 U.S.C. § 7206(1); [16] (3) that he used the U.S. Postal Service to send and deliver the false returns in violation of 18 U.S.C. § 1341; [17] and (4) that he filed or caused to be filed claims for tax refunds knowing full well that such claims were fraudulent in violation of 18 U.S.C. § 287. Consequently, the defendant's conviction on each of the 22 counts is AFFIRMED.

---

**15.** The trial judge noted defendant's argument that the concealment of the income (and subsequent notation of the repayments as returns of loans) was made solely to hide the sums from creditors. However, the government through its revenue statutes is also a creditor. There was no evidence presented at trial, other than Miller's self-serving statements, that he distinguished between the government and his other creditors, or that he intended to fulfill his obligations to any of them. Moreover, as observed by the trial judge, the recording of the payments as returns of loans rather than either income (salary) or return of capital really had ramifications only to one creditor, the government. The other creditors could attach those sums despite their categorization. However, the government cannot collect taxes, either from funds which are gross income (salary) or capital gains (return of capital in excess of the basis of the stock), if the taxable income is successfully disguised as non-taxable items.

**16.** While not argued by the appellant, we note that count 14 (Mrs. Miller's tax return for 1968) should have charged a violation of 26 U.S.C. § 7206(2) (assisting in the preparation of a false return) rather than 26 U.S.C. § 7206(1) (subscribing a false return). However, such error is not fatal where the indictment, as here, contains the elements of the offense intended to be charged, sufficiently apprises the defendant of what he must be prepared to meet, and is detailed enough to assure against double jeopardy. *United States v. Miller*, 491 F.2d 638 (5th Cir.), *cert. denied*, 419 U.S. 970, 95 S.Ct. 236, 42 L.Ed.2d 186 (1974).

**17.** Again, after briefs had been filed but prior to oral argument, appellant's counsel cited to us the case of *United States v. Henderson*, 386 F.Supp. 1048, 1050–1054 (S.D.N.Y.1974) for the proposition that the mail fraud statute was not intended by Congress to apply to a scheme to defraud the United States' in an attempt to evade the payment of taxes. *Henderson* is inconsistent with at least three other circuit court cases which have held that the mailing of false *state* tax returns constituted a violation of 18 U.S.C. § 1341. *See, United States v. Brewer*, 528 F.2d 492 (4th Cir. 1975); *United States v. Mirabile*, 503 F.2d 1065, 1066–1067 (8th Cir. 1974), *cert. denied*, 420 U.S. 973, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975); *United States v. Flaxman*, 495 F.2d 344, 348–349 (7th Cir.) *cert. denied*, 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974). We reject the holding in *Henderson*.