**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Michael WICK Defendant–Appellant.**

No. 00–10446.

D.C. CR–98–00162–ROS(WDK).

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 9, 2001.

Decided Feb. 11, 2002.

Before PREGERSON, RAWLINSON, Circuit Judges, and WEINER, District Judge [1].

MEMORANDUM [2]

Michael Wick appeals his jury trial conviction and sentence for tax evasion and aiding the filing of a false return. We affirm.

The facts are well known to the parties and will be repeated here only as is necessary to explain our decision. The indict-

---

1. Honorable Charles R. Weiner, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

2. This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as may be provided by 9th Cir. R. 36–3.

ment charging Wick contained five counts. Counts 1, 2 and 3 charged violations of 26 U.S.C. § 7201, willfully attempting to evade and defeat personal income taxes for tax years 1991, 1992 and 1993 respectively. Counts 4 and 5 of the indictment charged violations of 26 U.S.C. § 7206(2), aiding and assisting in the preparation of a false tax return. These counts involved the FY 1991–92 and 1992–93 corporate returns of Wick's closely held corporation, CTI. Following trial, the district court dismissed Count 4 relating to the corporate return for FY 1991–92, because there was no evidence that a person with the requisite authority signed that return.

## II.

As to the conviction for Count 5, Wick argues the government failed to establish willful intent to defraud the IRS because CTI's return was prepared by its accountant Schneider, whom, Wick argues, simply assumed that Wick's personal expenses improperly paid by CTI during the tax year, had been corrected. He asserts that Schneider failed to ask Wick or CTI's Chief Financial Officer if the information Schneider was given to prepare the returns was correct and thus failed to make reasonable inquiries into information he found incorrect, inconsistent, or incomplete.[3]

These arguments ignore the other evidence adduced by the government which was sufficient to prove willfulness. It was undisputed that Wick closely oversaw all aspects of the company's accounting and personally directed how the improper charges would be expensed by the company. This included purposely spreading large expenditures among several different categories to hide their true nature. Viewed from the light most favorable to the government, Wick's direction to the bookkeepers, both orally and in notations on accounting records, to charge CTI with his personal expenses, and how to categorize them for bookkeeping purposes, was sufficient to demonstrate that the act of charging the items to the company was willful. *See United States v. Tucker*, 133 F.3d 1208, 1218 (9th Cir.1998) (to prove willfulness, the government must show that the defendant intended to violate the law or knew that his actions would do so.) It was this conduct that government asserted constituted aiding and assisting or otherwise causing the preparation or presentation of a false return, not merely the act of transferring this information to the return. But for the improper bookkeeping entries, the return would not have been fraudulent; the return was based directly upon the accounting records kept over the course of the fiscal year, which the evidence showed Wick willfully caused to show that his personal expenses were legitimate expenses of the business. As any conduct, the likely effect of which would be to mislead or conceal, is sufficient to demonstrate willfulness, *Spies v. United States*, 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418 (1943), the government clearly met its burden. Wick's arguments regarding the role of Schneider go to the weight the jury assigned that evidence, not the sufficiency of the government's evidence of Wick's intent.

Wick's argument regarding the manner in which the real estate expenses were categorized suffers from the same problem. Wick argues the government improperly relied upon the evidence of CTI's

---

**3.** Wick also points to the fact that the FY 1992–93 return was signed by the CFO and not Wick, in arguing the government failed to demonstrate willfulness on Count 5. Unlike the 1991–92 return, there is no suggestion that the CFO was not authorized to sign the 1992–93 return on behalf of the company.

bookkeeper, Preston, who admitted she never discussed CTI's real estate business with Wick, to establish the improper classification of the expenses. This argument also goes to weight not sufficiency. It also ignores other evidence that the real estate, whose purchase and renovation costs were expensed on CTI's books, were never owned by CTI. Rather, it was titled in Wick's name and when sold, Wick retained the profits of the sale. Wick also retained the profits from sales of personalty that were paid by CTI as business expenses, such as an ATV and two snowmobiles. This demonstrated his knowledge that the expenses were indeed personal. Given this and the other evidence in the record, we find the government clearly demonstrated the willfulness element of § 7206(2).

■ Similarly, Wick arguments regarding the sufficiency of the evidence on the evasion counts relating to his personal returns also ignore other evidence that demonstrated willfulness. He contends the evidence of willfulness was insufficient because every alleged inaccuracy in his personal returns grew out of the alleged accounting "incompetence" at CTI. He cites as an example testimony that those at CTI responsible for preparing Form 1099s admitted they "forgot" to prepare them. He also points to the fact that he never affirmatively directed anyone at CTI to not prepare the forms. He asserts that all the amounts the government contends Wick failed to report as income were not income, but rather repayment of the loans he previously made to CTI, which CTI's bookkeepers failed to properly record as loan repayments on CTI's books. Finally, he asserts that the government failed to refute his contention that the expenses related to the real properties were made as part of joint ventures between him and

CTI. These arguments suffer several problems.

■ First, the evidence demonstrated that Wick himself directed how these personal expenses were to be entered on CTI's books, in several instances spreading the payments among several categories in an attempt to hide their true nature. Second, it is irrelevant whether these expenses *could have been* entered on CTI's book so that they would have had no present tax consequences to Wick.

> Where the taxpayer has sought to conceal income by filing a false return, he has violated the tax evasion statutes. It does not matter that that amount could have somehow been made non-taxable if the taxpayer had proceeded on a different course. To apply the constructive distribution rules to this situation would nullify all of the taxpayer's prior unlawful acts.

*United States v. Miller*, 545 F.2d 1204, 1214 (9th Cir.1976). *Miller* goes on to note

> At the time the funds are initially diverted it might well be argued that they could constitute either income or a return of capital. However once the taxpayer has assumed control of the funds and then fails to report such funds as income or to make any adjustments in the corporate books to reflect a return of capital, he has already violated the tax evasion statutes.

*Id.* at 1214 n. 12 *citing Spies*, 317 U.S. at 498–99. The language of this note directly refutes Wick's argument that the improperly paid expenses can be redesignated a return of loan principal after the fact. Accordingly, his argument that CTI's repayment of its loan would not constitute income to Wick is inapposite.[4]

---

4. Wick also argues that the district court

failed to properly instruct the jury on how to

In addition, Wick's assertion that there was insufficient evidence of willfulness because the witnesses testified that they merely "forgot" to issue Wick 1099 forms, goes to the weight of that evidence and not its sufficiency. It was for the jury to determine whether they believed this evidence, or whether someone who reports taxable income of $85,000 would forget he had nearly again that same amount—$77,-000—in income transfers that his company forgot to document on a 1099 form.

Wick's joint venture argument ignores other evidence which the jury could have used to find that no joint ventures ever existed. There was no documentation to support the existence of a joint venture; Wick never told any employees at CTI that he created any joint ventures; the sale proceeds went entirely to Wick. Viewing the evidence in the light most favorable to the government, the jury was within its bounds to conclude the joint ventures were a sham used by Wick to divert income out of CTI without paying tax.

Finally, Wick argues that his conviction on Count 1, which alleged tax evasion in 1991, must be vacated because the district court determined the CTI tax return for FY 1991–92 was never properly filed. He asserts that because no valid return existed, the government cannot impute disallowed business expenses to him, because CTI can still file a legitimate return properly characterizing those expenses as repayment of loans. This argument again ignores the fact that the government placed sufficient evidence before the jury for it to conclude that Wick evaded taxation at the point where he directed the bookkeepers to record the payments as business expenses, rather than against his loan accounts. Income is received when the taxpayer has an "undeniable accession[ ] to wealth, clearly realized, and over which the taxpayer has complete dominion." *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 431, 75 S.Ct. 473, 99 L.Ed. 483 (1955). Any attempt to argue that CTI could still go

determine whether a transaction constituted a loan for purposes of the income tax code. Specifically, he argues the district court failed to instruct on the seven factors listed in *Welch v. Commissioner*, 204 F.3d 1228, 1230 (9th Cir.2000). There is no indication that counsel ever raised or preserved this issue prior to the court's instructing the jury. Our standard of review is thus for plain error. *Jones v. United States*, 527 U.S. 373, 388, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999); *United States v. Anderson*, 201 F.3d 1145, 1148 (9th Cir. 2000).

In *Webb*, we said that the following factors are, while non-exclusive and no single factor is dispositive, indicia of a bona fide loan: (1) whether the promise to repay is evidenced by a note or other instrument; (2) whether interest was charged; (3) whether a fixed schedule for repayments was established; (4) whether collateral was given to secure payment; (5) whether repayments were made; (6) whether the borrower had a reasonable prospect of repaying the loan and whether the lender had sufficient funds to advance the loan; and (7)

whether the parties conducted themselves as if the transaction were a loan. *Id.* at 1230. The district court, again with no objection or preservation of the issue, charged the jury that "a loan which the parties to the loan agree is to be repaid does not constitute gross income as that term is defined by the Internal Revenue Code. However, merely calling a transaction a loan is not sufficient to make it such. When money is acquired and there is no good faith intent on the part of the borrower to repay the funds advanced, such funds are income under the income tax laws and taxable as such." The district court's failure to include the *Webb* factors was not plain error since there is no argument that it failed to adequately advise the jury how the law treats the taxability of loan proceeds or highly prejudiced Wick's substantive rights. Under a plain error review this is all that was necessary. *United States v. Garcia–Guizar*, 160 F.3d 511, 516 (9th Cir.1998) (plain error is a highly prejudicial error affecting substantial rights).

back and change its corporate records is refuted by our holding in *Miller* that once the taxpayer has assumed control of the funds and then fails to report such funds as income or to make any adjustments in the corporate books to reflect a return of capital, he has already violated the tax evasion statutes. *Id.,* 545 F.2d at 1214 n. 12.

### III.

■ In Count 4, the government charged that Wick willfully aided and assisted in the preparation and presentation of false and fraudulent corporate tax returns for fiscal year 1991–92. As mentioned above, the district court vacated the conviction on this count because the evidence at trial demonstrated that Jennifer Preston, the CTI bookkeeper, signed the return when she had no authority to do so. Wick argues that he was prejudiced by the introduction of evidence relating to that count. He also argues that Count 1, which charged a willful attempt to evade and defeat income taxes for tax year 1991, should have been dismissed, because it depended upon the jury convicting him on Count 4.

Under Fed.R.Evid. 402, the evidence which supported Count 4 was also relevant to Count 1 to show that Wick used CTI's funds for his personal benefit during 1991. The payment by CTI of Wick's personal expenses during the 1991–92 fiscal year, constituted income which should have been reported on Wick's calendar year 1991 personal return. The evidence of how CTI's bookkeepers recorded these expenses was clearly relevant to Count 1 to show Wick had dominion and control over the money without paying taxes on it.

■ It is thus irrelevant to the viability of the conviction on Count 1 whether the conviction on Count 4 was proper. Wick makes no cogent argument that there is a requirement of a quid pro quo to support the two convictions, i.e. that one conviction necessarily supported the other. The two counts charged different crimes related to different tax obligations. The legal defect the district used to overturn the conviction on Count 4—the failure of an authorized person to sign the return—had no bearing on the ultimate question of whether Wick realized income during that year which he willfully evaded on his personal return.

### IV.

■ Wick next takes issue with the amount of the tax loss to the government calculated by the probation officer and accepted by the district court at sentencing. The total tax loss was determined to be $348,693.56. Wick argues this amount disregarded CTI's net operating loss of $419,376 for FY 1993–94, which when carried back to FY 1992–93, would have allegedly reduced the total tax loss to $229,390. The application of a carry back is a question of law which we review de novo. We find the district court was correct in not taking the carry back into consideration in determining the total tax loss.

Wick concedes that in tax evasion cases, a net operating loss is generally not a factor at trial or sentencing. He argues that his is a special case because CTI's net operating loss was known at the time the 1992–93 corporate tax return was filed, Wick cites no authority to support this argument. Although the Ninth Circuit has never addressed the issue of whether a net operating loss may be carried back to reduce the total tax loss in a tax evasion case, cases from other circuits have uniformly rejected allowance of such a carry back. *See A.C. Willingham v. United States,* 289 F.2d 283 (5th Cir.1961) (crime of tax evasion is complete when, with willful intent, a false and fraudulent return is

filed for a year as to which there would still be a tax but for the fraud; any adjustment that may be permissible resulting from subsequent losses does not prevent the fraud already committed from being an attempt to evade or defeat tax); *United States v. Keltner,* 675 F.2d 602 (4th Cir. 1982) (subsequently incurred net operating loss cannot be carried back to eliminate a tax liability that existed at the time the return was required to be filed; otherwise the defendant may escape conviction by reason of the fortuity of a later loss that would reduce or eliminate misstatements of tax liability fraudulent when made). We agree that permitting the use of a carry back to reduce the total tax loss to the government would permit the taxpayer to further manipulate the fortuity of the later loss to eliminate the prior evaded tax by simply delaying the filing of the fraudulent return. In addition, if there was some other reason for the delay, the taxpayer could deliberately falsify the return with impunity knowing that if he was caught he could always claim the carry back. If not caught, the taxpayer would then be free to apply the loss forward to diminish a future year's tax liability. We thus conclude that Wick may not attempt to use CTI's subsequent losses to lower the total tax loss to the government.

## V.

Finally, Wick argues the district court erred in failing to depart downward based on diminished capacity. A district court's discretionary refusal to depart from the Guidelines is not reviewable on appeal. *United States v. Davoudi,* 172 F.3d 1130, 1133 (9th Cir.1999) However, if the trial court indicated that it did not have discretion under the Guidelines to depart, that determination is reviewed de novo. *Id.* There is nothing in the record of the sentencing that would indicate the district court thought it had no discretion to

award the downward departure for diminished capacity. Indeed, the district court's statements indicated the contrary, that the court knew it had discretion and exercised that discretion because it did not believe Wick's evidence. As such, its decision to deny the downward departure is not subject to review.

AFFIRMED.