UNITED STATES of America,
Plaintiff–Appellee,

v.

Michael H. BOULWARE,
Defendant–Appellant.

United States of America,
Plaintiff–Appellant,

v.

Michael H. Boulware, Defendant–
Appellee.

Nos. 02–10287, 02–10338.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 1, 2003.

Filed Sept. 14, 2004.

Robert J. Waters, Santa Monica, CA, Dennis E.W. O'Connor, Honolulu, HI, for the defendant-appellant and cross-appellee.

Karen M. Quesnel, Tax Division, U.S. Department of Justice, Washington, DC, for the plaintiff-appellee and cross-appellant.

Before TASHIMA, THOMAS, and SILVERMAN, Circuit Judges.

Opinion by Judge TASHIMA; Dissent by Judge SILVERMAN.

TASHIMA, Circuit Judge.

Michael H. Boulware appeals from his conviction, after trial by jury, on five counts of filing false tax returns, four counts of tax evasion, and one count of conspiracy to make false statements to a federally-insured financial institution. He contends that all of his convictions must be reversed because the government failed to meet its burden of proof on the tax counts, constructively amended the indictment during trial, and engaged in prosecutorial misconduct. He also contends that the district court prejudicially erred in excluding key evidence and giving inadequate and misleading jury instructions. Finally, he contends that his sentence must be vacated, because the district court failed to resolve factual disputes regarding the amount of the tax loss. In its cross-appeal, the government contends that the district court erred by refusing to enhance Boulware's sentence for obstruction of justice.

Although most of the errors alleged by Boulware do not warrant reversal of his convictions, one of them does. The district court abused its discretion by excluding evidence of a state-court judgment that directly supported Boulware's defense to the tax charges and that directly contradicted the government's theory of the case—that Boulware had stolen money from his closely-held corporation and gifted it to his girlfriend. As the error went to the heart of Boulware's defense and was

not harmless beyond a reasonable doubt, Boulware is entitled to a new trial on the nine tax counts.

## I

After a six-year investigation by the Internal Revenue Service ("IRS"), Boulware was indicted on four counts of filing false tax returns for the 1989–1992 tax years, in violation of 26 U.S.C. § 7206(1), one count of conspiring to make a false statement to a federally-insured financial institution, in violation of 18 U.S.C. § 371, and four counts of making such false statements, in violation of 18 U.S.C. § 1014. A tenth count sought forfeiture of funds associated with the false statements. A superseding indictment added five new counts of filing false tax returns, for the 1993–1997 tax years. and four counts of tax evasion, in violation of 26 U.S.C. § 7201, for the 1994–1997 tax years. Finally, a second superseding indictment ("the indictment"), amended the factual allegations of the conspiracy count.

After a six-day trial and two-and-a-half days of deliberations, the jury convicted Boulware on November 29, 2001, of all nine tax counts.[1] The jury also convicted him of conspiring to make false statements to a federally-insured financial institution, but acquitted him of the substantive false statements counts. The district court sentenced Boulware to a 36–month term of imprisonment on each of the false tax return counts, 51 months on each of the tax evasion counts, and 51 months on the conspiracy count, all terms to run concurrently.[2]

## II

Boulware started M & S Vending in 1979, while working as a telephone repairman. The company placed video games in bars and restaurants, and it quickly expanded into other lines of business, such as cigarette sales. In about 1985, the company was renamed Hawaiian Isles Enterprises ("HIE"); Boulware owned all of the shares. HIE branched out into coffee roasting and sales, and formed a subsidiary named Hawaiian Isles Kona Coffee Company. Boulware later acquired a bottled water company and transferred its stock to HIE. By 1989, HIE was reporting gross receipts of over $55 million, and by 1992 sales had topped $85 million.

At trial, the government sought to prove that Boulware had systematically diverted funds from HIE in order to support a lavish lifestyle. In particular, that he gave millions of dollars of HIE money to his girlfriend, Jin Sook Lee, and millions of dollars to his wife, Mal Sun Boulware, without reporting any of this money on his personal income tax returns. According to the government, he siphoned off this money primarily by writing checks to employees and friends and having them return the cash to him, by diverting payments by HIE customers, by submitting fraudulent invoices to HIE, and by laundering HIE money through companies in the Kingdom of Tonga and Hong Kong.

With regard to the false statements counts, the government attempted to prove that Boulware and a business associate named Lorin Kushiyama received financing from General Electric Credit Company ("GECC") based on the submission of false invoices. In particular, the government

---

1. During trial, the false tax return counts for the 1994–1997 tax years were severed, redacted from the indictment, and later dismissed with prejudice.

2. The court also imposed a three-year term of supervised release, fines, and forfeiture of $495,814.

tried to prove that the financing was purportedly to allow Kushiyama's company to purchase video game machines that it would then lease or sell to HIE. According to the government, HIE already owned the machines and Kushiyama gave the loan proceeds to Boulware.

The defense case was that Boulware did not underreport income in any of the relevant tax years, because HIE maintained beneficial ownership of all of the funds in question. Even if he did underreport his income, he at all times acted in good-faith reliance on the advice of counsel.

According to Boulware, he intended to use most of the money at issue in this case to buy out his wife's marital interest in HIE and the money was therefore not, or at least arguably not, taxable to him. He asked his wife for a divorce in 1987, and she threatened to force him to liquidate HIE unless he agreed to give her $5 million and a $1 million house. Boulware and his wife realized that it would take time for HIE to buy out her interest. When he told Jin Sook Lee about the agreement, she asked to hold the money as it was accumulating, because she wanted to make sure he saved it for the divorce. His lawyer advised him that (1) his wife had a right to half of the company as her marital share of HIE, and (2) if Lee held the funds in trust for HIE, the money would not be taxable to Boulware.

Boulware testified that by 1994 he had collected enough HIE money to redeem his wife's share of the company and finalize their divorce. Lee, however, refused to return the money. For this reason, Boulware had to scramble to obtain other funds to buy out his wife's marital interest. For example, he received a $1.7 million loan from Harold Okimoto. Finally in 1997, a Hawaii state-court jury found that the money Lee was holding belonged to HIE.

The state court ordered Lee to return the money to HIE.

The defense also tried to show that, despite Boulware's success as an entrepreneur, he was a relatively unsophisticated person who neither understood nor paid attention to accounting issues. A certain disregard of corporate formalities was also due to the fact that he owned and ran the company. In addition, the nature of his business (e.g., purchasing coffee beans in cash from growers on Kona) required that he receive corporate advances to make deals. He always informed his comptroller Merwyn Manago of these transactions, and they were (or Boulware was under the impression that they were) reported on HIE's books and tax returns.

With regard to the GECC loans, the defense made a case that the transactions were not fraudulent. What the government portrayed as false invoices were really legitimate appraisals of the video game machines, which were to serve as collateral for a loan from GECC to HIE.

## III

### A. Exclusion of the State–Court Judgment

Boulware argues that the district court improperly excluded evidence of a Hawaii civil judgment, which determined that HIE owned the money that Boulware had given to Jin Sook Lee between 1987 and 1994. As the state court found that Boulware had not gifted the funds to Lee and that the funds belonged to HIE, he contends that he had no federal tax liability for those funds. He argues that the improper exclusion of this evidence violated his due process right to present evidence in his defense.

### 1. Standard of Review

▮ We generally review a district court's evidentiary rulings for abuse of

discretion. *United States v. Sua,* 307 F.3d 1150, 1152 (9th Cir.2002), *cert. denied,* 537 U.S. 1221, 123 S.Ct. 1327, 154 L.Ed.2d 1078 (2003). Under this standard, reversal is appropriate only where the trial court made an error of law or a clearly erroneous finding of fact, or where the reviewing court has "'a definite and firm conviction that the district court committed a clear error of judgment.'" *United States v. Finley,* 301 F.3d 1000, 1007 (9th Cir.2002) (quoting *United States v. Benavidez–Benavidez,* 217 F.3d 720, 723 (9th Cir.2000)). We review de novo the district court's interpretations of the Federal Rules of Evidence. *United States v. Angwin,* 271 F.3d 786, 798 (9th Cir.2001).

## 2. Factual Background

On October 7, 1994, over a year after Boulware became aware that the IRS was investigating him, but four-and-a-half years before he was indicted, Jin Sook Lee filed a complaint for conversion, breach of contract, and unjust enrichment against Boulware and HIE in Hawaii state court. In the complaint, Lee alleged that Boulware, individually and as an agent of HIE, had taken $840,000 in cash from a safe in her home, had wrongfully acquired a real property belonging to her, and had defaulted on a $1.2 million note. She sought compensatory and punitive damages.

On November 17, 1994, Boulware and HIE answered Lee's complaint and denied all the relevant allegations. Boulware and HIE also filed a counterclaim against Lee for breach of contract, breach of fiduciary duty, unjust enrichment, constructive trust, conversion, quiet title, accounting, declaratory relief, cancellation of instruments, and compensatory and punitive damages.

In Boulware and HIE's counterclaim, they alleged the following facts regarding the payments to Lee:

5. In 1987, Boulware was married to Mal Sun Boulware. At that time, due to irreconcilable differences, Michael Boulware and Mal Sun Boulware agreed that they would get divorced because their marriage was beyond redemption. Boulware understood and realized that division of the marital property would require substantial sums of cash and properties in order to satisfy his wife's demands. Boulware wanted to insure that he would not have to sell [HIE] as a result of the divorce. Boulware advised Lee that he and his wife had decided to divorce and advised her of the parties' property division discussions and agreements and that such agreements would require the payment of substantial sums in cash and properties....

6. Commencing in or about 1987 [HIE] advanced monies from time to time to Boulware pursuant to oral and written understandings and debt instruments whereby Boulware agreed to account for and repay all such monies not properly accounted for as business expenditures incurred on behalf of the company. Commencing in or about 1987 and continuing through approximately 1993, Boulware transferred directly to Lee, or caused [HIE] to deliver to Lee, certain monies pursuant to the oral and written understandings referenced above. At all times, Lee understood and agreed that all such funds not used by Boulware and Lee for purposes of advancing the business interests of [HIE], had to be repaid in full to Boulware and [HIE]. Lee further understood and agreed that a portion of the funds paid back by her would be used to satisfy the property settlement agreements between Boulware and his then wife Mal Sun Boulware.

\* \* \*

22. At all times relevant herein, a confidential relationship existed between

Lee and Counterclaimaints. Based upon and arising out of said confidential relationship, Counterclaimants transferred to Lee monies and properties valued in excess of $5 million. Lee promised to hold said assets for the benefit of[HIE] and to prevent their dissipation and to reconvey them to Counterclaimants upon demand....

Boulware and HIE sought a declaration that the transfers to Lee were not gifts.

After a trial on the merits, the jury found that the monies were not gifts and that the monies belonged to HIE. The relevant question on the special verdict form read, as follows:

*Question No. 10.* Jin Sook Lee claims the cash and checks delivered to her, during the period from March, 1987 to May, 1994, by Michael Boulware and Hawaiian Isles Enterprises were gifts. Michael Boulware and Hawaiian Isles Enterprises claim the monies were not gifts but were to be held by Jin Sook Lee and to be returned when requested. State your findings below:
The monies were gifts
to Jin Sook Lee Yes ___ No ✓

The monies belong
to Hawaiian
Isle Enterprises Yes ✓ No ___

Likewise, in deciding the equitable issues of unjust enrichment and constructive trust, the state court judge found by clear and convincing evidence that the monies were not gifts to Lee. The judgment provides in relevant part:

As to Counts I, III, IV and V, judgment in favor of Defendant/Counterclaimant HAWAIIAN ISLES ENTERPRISES, INC. and against Plaintiff [Lee] in the amount of $4,551,931.00, said amount being the property of Defendant/Counterclaimant HAWAIIAN ISLES ENTERPRISES, INC. which has been and is

being held in constructive trust by Plaintiff and by which Plaintiff has been and is being unjustly enriched[.]

In this case, Boulware moved to adopt as controlling the state court's determination that the money belonged at all times to HIE and was therefore not taxable to him. The district court denied the motion on the ground that the jury only determined ownership of the money as between Lee and HIE, and was not asked to determine ownership as between HIE and Boulware.

Boulware then filed a motion in limine to preclude the government from referring to the monies transferred to Lee as gifts, a factual issue that had been subject to adversarial testing in the state court, or alternatively to allow the introduction of the state court judgment to rebut the government's gift theory. The government in turn filed a motion in limine to exclude introduction of the state court judgment on four grounds: (1) the judgment had no preclusive effect, because the United States was not a party to the state action; (2) the state court judgment was not relevant, because it determined ownership of the moneys only as between Lee and HIE and so was not inconsistent with the theory that the money was reportable income to Boulware; (3) the judgment was unreliable, and admitting the judgment would confuse the jury and would lead to a minitrial to show the deficiencies in the evidence considered in the state case; and (4) the judgment was inadmissible hearsay.

In Boulware's opposition to the government's motion in limine, he argued that collateral estoppel is not the issue. Rather, as a determination of property rights, the state court judgment has preclusive effect for purposes of determining whether he had a federal tax liability. In addition, the state court judgment was relevant to the issue of whether he gifted money to

Lee and thereby diverted HIE money for personal purposes. The judgement would also allow him to argue that his failure to amend his tax returns was in good-faith reliance on the state court judgment. He further argued that the district court did not have jurisdiction to question the reliability of the state court judgment absent a showing of collusion. Finally, Boulware argued that the judgment was admissible as a record of property rights under Federal Rule of Evidence 803(14), and that its probative value far outweighed any danger of unfair prejudice, confusion of the issues, or waste of time.

The district court granted both motions, explaining that "the characterization of this transfer as a gift is not relevant to the ultimate issues of the case" and that the jury should decide the case based on the testimony of the witnesses. The court ruled that no witnesses should discuss the state court judgment, but that he would leave the matter open to reconsideration.

At trial, the government at times suggested to the jury that Boulware gave the money to Lee as a gift, arguing, for example, that Boulware spent the money "to support a lifestyle of a Porsche, a Blazer, a Mercedes; enough of a lifestyle to support an estate in Kahala; support both a wife and a girlfriend, both of whom received millions of dollars...." At other times, however, the government argued that Boulware gave the money to Lee to hide it from the IRS, to hide it from his wife, or to use HIE money to pay off his own obligation to his ex-wife, arguing, for example, that Boulware took the money so that he "could dump his wife without paying a dime." The court sustained the government's objections to questions about the judgment. Boulware himself testified without objection, however, that he ended up in a lawsuit with Lee to force her to return the money, and that she was forced to return $5 million or $6 million to HIE.

### 3. Analysis

#### a. Does the State Judgment Have Preclusive Effect?

Boulware argues that the state court judgment precluded the government from relitigating the ownership of the funds he delivered to Lee. He bases his argument not on the affirmative defense of collateral estoppel, because the government was not a party to the state lawsuit, but rather on the principle that state law determines the property rights to which federal law attaches tax consequences. Because the state court jury found that Boulware had not gifted the funds to Lee and that the funds belonged to HIE, he argues that he had no federal tax liability for those funds. We disagree.

Boulware relies on cases such as *Freuler v. Helvering*, 291 U.S. 35, 54 S.Ct. 308, 78 L.Ed. 634 (1934), *Blair v. Comm'r*, 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465 (1937), and *Flitcroft v. Comm'r*, 328 F.2d 449 (9th Cir.1964). These tax cases stand for the proposition that federal courts must treat as binding state court determinations on questions of state law as long as the judgments were not obtained through collusion. In *Flitcroft*, for example, the question was whether the retroactive reformation of a trust by a state court could wipe out a federal tax liability for previous years. *Id.* at 453. We held that the state court proceeding was not collusive and therefore "the adjudication of the state court is given effect, 'not because it is res judicata against the United States, but because it is conclusive of the parties' property rights which alone are to be taxed.'" *Id.* at 459 (quoting *Gallagher v. Smith*, 223 F.2d 218 (3d Cir.1955)).

These authorities, however, have somewhat been called into question by the Su-

preme Court's 1967 decision in *Commissioner v. Bosch,* 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967). There, the Court held that "where the federal estate tax liability turns upon the character of a property interest held and transferred by the decedent under state law, federal authorities are not bound by the determination made of such property interest by a state trial court." *Id.* at 457, 87 S.Ct. 1776; *see also id.* at 465, 87 S.Ct. 1776 ("[W]hen the application of a federal statute is involved, the decision of a state trial court as to an underlying issue of state law should *a fortiori* not be controlling"). *Bosch* is distinguishable, however, because it dealt with the federal estate tax statute, and the Court appeared to give great weight to a statement in the legislative history that " 'proper regard,' not finality, 'should be given to interpretations of the will' by state courts and then only when entered by a court 'in a bona fide adversary proceeding.' " *Id.* at 463–64, 87 S.Ct. 1776.

■ It is clear, therefore, that with regard to the calculation of estate taxes, federal courts are not bound by the judgments of a state probate court. *See, e.g., Estate of Rapp v. Comm'r,* 140 F.3d 1211, 1215–16 (9th Cir.1998). What effect, if any, *Bosch* has outside the context of the estate tax statute is unclear. The Fifth Circuit has held that "[t]he relevance of a state court's judgment to the resolution of a federal tax question will vary, depending on the particular tax statute involved as well as the nature of the state proceeding that produced the judgment." *Estate of Warren v. Comm'r,* 981 F.2d 776, 781 (5th Cir.1993) (quoting *Brown v. United States,* 890 F.2d 1329, 1342 (5th Cir.1989)).

■ Supreme Court precedent pre and post-*Bosch* suggests that its holding does not apply outside of the estate-tax context. In *Aquilino v. United States,* 363 U.S. 509,

80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960), the Court made the following observation:

> It is suggested that the definition of the taxpayer's property interests should be governed by federal law, although supplying the content of this nebulous body of federal law would apparently be left for future decisions. We think that this approach is unsound because it ignores the long-established role that the States have played in creating property interests and places upon the courts the task of attempting to ascertain a taxpayer's property rights under an undefined rule of federal law. It would indeed be anomalous to say that the taxpayer's "property and rights to property" included property in which, under the relevant state law, he had no property interest at all.

*Id.* at 513 n. 3, 80 S.Ct. 1277. More recently, in *United States v. Craft,* 535 U.S. 274, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002), the Court held that "[s]tate law determines only which sticks are in a person's bundle. Whether those sticks qualify as 'property' for purposes of the federal tax lien statute is a question of federal law." *Id.* at 278–79, 122 S.Ct. 1414; *see also Pahl v. Comm'r,* 150 F.3d 1124, 1128 (9th Cir.1998) (holding that "we look to federal law to determine what interest creates tax liability. We look, however, to state law to determine whether the taxpayer has the requisite interest.").

Even assuming that the state court judgment is binding as to the ownership of the funds, the question becomes what the state court judgment determined. At a minimum, the state court determined that the money Boulware transferred to Lee was not a gift. The money could still be income to Boulware, however, if he gave it to Lee to hold for him in an effort to hide it from the IRS. *See Chism v. Comm'r,* 322 F.2d 956, 959–60 (9th Cir.1963) (holding

that the tax court did not err in refusing to be bound by a state court determination that withdrawals from a closely-held corporation were loans and not dividends, because "it is not the existence of a legal obligation to repay that is controlling"; rather, whether a withdrawal is a loan "is a factual question 'to be determined upon consideration of all the circumstances present in a particular case, and depends upon the existence of an intent at the time the withdrawal is made that it should be paid back.'" (quoting *Clark v. Comm'r*, 266 F.2d 698, 710–11 (9th Cir.1959))).

Boulware argues that the state court finding that Lee was holding the money in trust for HIE is also binding. The state court did find that the money in question belonged to HIE and that Lee had been and was holding it in "constructive trust" for HIE. On the other hand, although the record from the state court action is not part of the record on appeal, the ownership of the money as between Boulware and HIE does not appear to have been subject to adversarial testing. The special verdict form asked the jury to determine ownership only as between Lee and HIE, presumably because Boulware never claimed the money was his. If Lee maintained that she had received the money as a gift, and Boulware contended that he had given her the money to hold in trust for HIE, there would have been no reason to ask the jury if Boulware owned the money, because it was not an issue in the lawsuit.

For these reasons, we hold that the district court did not err in ruling that the state court judgment does not have preclu-

sive effect as to the ownership of the monies.

b. *Was the State–Court Judgment Admissible Evidence?*

(1) *Relevance*

Even though the state court judgment did not have preclusive effect, the question still remains whether it was admissible evidence that the district court improperly excluded. The district court excluded the state court judgment pursuant to Federal Rules of Evidence 401 and 402, stating that whether the transfers to Lee were gifts "is not relevant to the ultimate issues of the case." This ruling was erroneous. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Whether Boulware transferred the HIE funds to Lee for personal purposes or for her to hold in trust for HIE was a key issue in the case. That he pursued a successful litigation against Lee to force her to return the monies to HIE has some tendency to make it more likely that he gave the monies to her to hold in trust. Indeed, the government conceded at oral argument that the state court judgment is relevant.[3]

(2) *Hearsay*

Hearsay is "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter

---

3. The dissent's argument that the judgment "does not prove, or even tend to prove" that Boulware did not siphon off the money from HIE is mistaken, both legally and factually. For evidence to be relevant, and thus admissible, Rule 401 does not require that it "prove" anything. Rule 401's only requirement is that the proffered evidence have a *tendency* to prove a fact in issue and the judgment certainly has *some* tendency to make Boulware's explanation (that he gave the money to Lee to hold in trust for HIE) more probable and the government's theory of the case (that he simply gave the money to Lee) less probable. Rule 401 requires no more.

asserted." Fed.R.Evid. 801(c). A prior judgment is therefore hearsay to the extent that it is offered to prove the truth of the matters asserted in the judgment. A prior judgment is not hearsay, however, to the extent that it is offered as legally operative verbal conduct that determined the rights and duties of the parties. *See United States v. Pang,* 362 F.3d 1187, 1192 (9th Cir.2004). Although Rule 803 contains exceptions for certain kinds of judgments, such as judgments of previous felony convictions and judgments as to personal, family, or general history or boundaries, *see* Fed.R.Evid. 803(22) & (23), civil judgments do not fit comfortably into any hearsay exception.[4]

Boulware argues that the state court judgment fits the exceptions set forth in Rule 803(14) and (15). The first of these exceptions concerns records of documents that affect an interest in property, and reads as follows:

> **Records of documents affecting an interest in property.** The record of a document purporting to establish or affect an interest in property, as proof of the content of the original recorded document and its execution and delivery by each person by whom it purports to have been executed, if the record is a record of a public office and an applicable statute authorizes the recording of documents of that kind in that office.

Fed.R.Evid. 803(14).

In *United States v. Perry,* 857 F.2d 1346 (9th Cir.1988), a criminal tax prosecution, the government introduced testimony regarding a bankruptcy court's determination that certain transfers of property were fraudulent conveyances. *Id.* at 1351. We held that admission of the testimony was not plain error:

> The challenged testimony was not, as Perry urges, offered as substantive proof of a fraudulent scheme. A review of the record shows that the testimony was offered only to show that Perry was the true owner of certain properties nominally owned by his relatives. *See Greycas, Inc. v. Proud,* 826 F.2d 1560, 1567 (7th Cir.1987) ... ("a judgment, insofar as it fixes property rights, should be admissible as the official record of such rights, just like other documents of title"). This evidence, in turn, was relevant to prove that Perry had concealed his assets. From it, the jury could infer that Perry had intended to evade federal income taxes, charges for which he was on trial.

*Id.* at 1351–52 (footnote and ending citation omitted). Similarly, in *Greycas, Inc. v. Proud,* 826 F.2d 1560 (7th Cir.1987), a case on which *Perry* relied, the Seventh Circuit noted that the state court judgment at issue in the case should be admissible under Rule 803(14) to show the priority of liens, "fix[ing] Greycas's rights, equivalent to title, in Crawford's farm machinery." *Id.* at 1567 (citing Rule 803(14)).

█ Thus, *Perry* supports the proposition that a previous judgment is admissible under Rule 803(14) to show the ownership of assets. To the extent that Boulware offered the judgment simply for the purpose of establishing HIE's ownership of the funds in 1997 and Lee's legal obligation to return those funds, he was offer-

---

4. Certain kinds of judgments fall under statutory or common law exceptions. *See, e.g.,* 15 U.S.C. § 16(a) (providing that "[a] final judgment or decree heretofore or hereafter rendered in any civil or criminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any action or proceeding brought by any other party against such defendant under said laws as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto").

ing the judgment not for the truth of the matters asserted in the judgment, but rather to establish the judgment's legal effect. As this is a nonhearsay purpose, we see no need to resort to the hearsay exception set forth in Rule 803(14).

■ Moreover, to the extent that Boulware offered the judgment for the truth of the matters asserted—to establish that he had not gifted the funds to Lee and that she was and had been holding them in constructive trust for HIE—the judgment meets the exception set forth in Rule 803(15):

> **Statements in documents affecting an interest in property.** A statement contained in a document purporting to establish or affect an interest in property if the matter stated was relevant to the purpose of the document, unless dealings with the property since the document was made have been inconsistent with the truth of the statement or the purport of the document.

The Federal Rules of Evidence are an act of Congress, and we must therefore interpret Rule 803(15) as we would a statute, *see Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 587, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), in accordance with its plain meaning, *see Bourjaily v. United States,* 483 U.S. 171, 178–79, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987) (interpreting Rule 104 in accordance with its plain meaning); *see also Garcia v. United States,* 469 U.S. 70, 75, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984) (noting that "only the most extraordinary showing of contrary intentions from [the legislative history] would justify a limitation on the 'plain meaning' of the statutory language").

Under the plain meaning of Rule 803(15), hearsay statements are admissible if they are contained within a document that affects an interest in property, if the statements are relevant to the purport of the document, and if dealings with the property since the document was made have not been inconsistent with the truth of the statements. *See Silverstein v. Chase,* 260 F.3d 142, 149 (2d Cir.2001). Here, the state court judgment meets each of these requirements. The judgment affected an interest in property by declaring HIE to be the legal owner of the funds and by requiring Lee to return them to HIE, and the statements are relevant to the purport of the document. In addition, there is no indication that the parties acted inconsistently with the judgment; it was undisputed that the judgment was valid and could be authenticated.

The legislative history is not clearly to the contrary. The Advisory Committee's note to Rule 803(15) explains that "[d]ispositive documents often contain recitals of fact" and that "[u]nder the rule, these recitals are exempted from the hearsay rule." Although the note uses the example of a deed, a judgment that establishes the ownership of disputed items of property is no less of a dispositive document, and the judgment's recital of facts is no less exempt from the hearsay rule. For these reasons, we hold that the state court judgment was admissible under Rule 803(15) as a document that affected an interest in property.

Finally, the district court excluded on relevance grounds not only the state court judgment and testimony about the judgment, but also testimony about the underlying lawsuit between Lee and Boulware. For example, the court would not allow Boulware's tax attorney to testify about the lawsuit for the nonhearsay purpose explaining why he had advised Boulware not to list the monies transferred to Lee as income. For all of the reasons discussed above, the hearsay rule did not prohibit Boulware from introducing the state court judgment or testimony about the underlying lawsuit.

### (3) *Rule 403*

In its motion in limine to exclude the state court judgment, the government argued that the judgment was unreliable, and admitting the judgment would confuse the jury and would lead to a mini-trial to show the deficiencies in the evidence considered in the state case.

 At a minimum, the state court's finding that HIE owned the money in 1997 was relevant to show that HIE had owned the money all along and to rebut the government's suggestions that Boulware had concocted the whole "Lee as trustee" story to defend himself in the criminal prosecution.[5] Any danger that the jury would have given undue weight to the state court judgment could have been dealt with by a cautionary instruction. Likewise, even if introduction of the judgment would have led the prosecution to cross-examine witnesses about deficiencies in the evidence heard by the state court jury, the trial judge should easily have been able to control any waste of time or confusion of the issues, so that admission of the state court judgment would not have substantially outweighed the probative value of the evidence.[6]

### (4) *Harmless Error*

 Although it was error to exclude the state court judgment, the error is not reversible if it was harmless. If the error amounts to a constitutional violation, we apply the "harmless beyond a reasonable doubt" standard. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

 "[N]ot every hearsay error amounts to a constitutional violation. At a minimum, a defendant must demonstrate that the excluded evidence was important to his defense." *United States v. Lopez–Alvarez*, 970 F.2d 583, 588 (9th Cir.1992); *see also United States v. Saenz*, 179 F.3d 686, 689 (9th Cir.1999) (holding that "[e]rror cannot be harmless where it prevents the defendant from providing an evidentiary basis for his defense"). Here, the state-court judgment was crucial to Boulware's defense on the tax counts, and the judgment directly contradicted the government's theory of the case. The district court's exclusion of the judgment denied Boulware "a meaningful opportunity to present a complete defense," *Lopez–Alvarez*, 970 F.2d at 587–88, and thus violated his due process rights. We must therefore reverse unless the error was harmless beyond a reasonable doubt.

 The government argues that the error was harmless because Boulware himself testified on direct examination about the judgment.[7] Boulware makes the point,

---

**5.** The prosecutor argued, for example, that there was no evidence that Boulware owed his wife anything "except in the rather fertile imagination of [his counsel]."

**6.** The dissent "would hold that the district court did not abuse its discretion in ruling the Hawaiian judgment inadmissible," based on its belief that the district court conducted an "[i]mplicit ... evaluation of probative value." The district court, however, did not perform a Rule 403 balancing analysis; rather, it simply held that the evidence was "not relevant to the ultimate issues of the case" and granted the government's motion to exclude the judgment "pursuant to Rules 401 and 402 of the Federal Rules of Evidence." We therefore review de novo, rather than for abuse of discretion, whether the judgment was properly excludable under Rule 403.

**7.** Boulware's testimony on this subject was as follows:

 Q. So, during that time period, in the spring of '94, after you got your divorce,

however, that he was the least effective witness to testify about the judgment because of his perceived self-interest and bias. In addition, although he called witnesses who testified that HIE at all times owned the funds that he transferred to Lee and that he relied in good faith on the advice of his lawyer and accountants in not reporting the funds on his tax returns, he points out that the prosecution sharply attacked the credibility of these witnesses, and the judgment would have been key corroborative evidence.

Another reason the exclusion of the state court judgment may have been harmless is that Boulware's story was somewhat implausible. Rather than setting up a formal arrangement by which money would be held in trust to buy out his wife's interest in HIE, Boulware gave corporate money to his girlfriend. In addition, he transferred the money to her in a series of shady transactions. Rather than putting the cash in a bank account so that it could earn interest, Lee held the cash in a safe in their home. Finally, Boulware did not sue Lee for a return of the funds until she sued him.

Nevertheless, the beneficial ownership of the funds that Boulware transferred to Lee was central to the entire case against him, and the government did not call Lee or any other witness to rebut Boulware's claim that he gave the money to her to hold in trust for the purchase of his ex-wife's marital interest.[8] Boulware's attorney Michael McCarthy testified that in 1987 Boulware retained him to establish a trust for Boulware and Lee's nonmarital son, Glenn Lee Boulware. Half of the shares of HIE were put into the trust. McCarthy advised Boulware that Lee, as the trustee of a trust that held a 50% ownership interest in HIE, would be a constructive trustee of any assets she received that belonged to HIE. He advised Boulware that any HIE property given to Lee would continue to belong to HIE, and would never belong to Lee or Boulware.

In the end, we are not convinced beyond a reasonable doubt that the jury would have arrived at the same verdict had testimony regarding the state court judgment and the judgment itself not been excluded. We therefore reverse Boulware's convictions on all of the tax evasion and false tax return counts and remand for a new trial.

## B. Sufficiency of the Evidence

■ Boulware also contends that we must reverse his convictions for filing false tax returns and tax evasion because the government failed to prove that he underreported his income. Although we reverse Boulware's conviction, we must still consider his contention that the evidence was insufficient to sustain his conviction,

---

did Jin Sook Lee agree to return the company's money to HIE?

A. No.

Q. Did you end up in lawsuits with Jin Sook Lee to force her to return the money?

A. Yes.

Q. And then approximately in 1997, was Jin Sook Lee forced to return money to the company?

A. Yes.

Q. Approximately how much?

A. Five, six million.

Q. I'm sorry?

A. Five, six million.

Q. But during the time period from 1994 to '97, the company didn't receive its money back from Jin Sook Lee, did it?

A. No.

8. The government did call Boulware's ex-wife, Mal Sun Boulware, to the stand, but she did not necessarily help the government's case. On cross-examination, she confirmed that when Boulware asked her for a divorce in 1987, she demanded $5 million and a $1 million house because she believed she had an ownership interest in HIE.

because a challenge to the sufficiency of the evidence implicates a defendant's rights under the Double Jeopardy Clause. *See United States v. Recio,* 371 F.3d 1093, 1104 (9th Cir.2004); *United States v. Gergen,* 172 F.3d 719, 724–25 (9th Cir.1999).

### 1. Standard of Review

Where, as here, the defendant made timely motions for acquittal, we review his insufficiency of the evidence claim de novo. *United States v. Odom,* 329 F.3d 1032, 1034 (9th Cir.2003). We will deny the claim if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime proved beyond a reasonable doubt. *Id.*

### 2. Analysis

Boulware was convicted on counts 1–5 of filing false tax returns in violation of 26 U.S.C. § 7206(1) for the 1989–1993 tax years. He was also convicted on renumbered counts 6–9 of tax evasion in violation of 26 U.S.C. § 7201 for the 1994 1997 tax years.

The elements of the offense of filing false tax returns under § 7206(1) are as follows:

> (1) the defendant made and subscribed a return, statement, or other document that was incorrect as to a material matter; (2) the return, statement, or other document subscribed by the defendant contained a written declaration that it was made under the penalties of perjury; (3) the defendant did not believe the return, statement, or other document to be true and correct as to every material matter; and (4) the defendant falsely subscribed to the return, statement, or other document willfully, with the specific intent to violate the law.

*United States v. Marabelles,* 724 F.2d 1374, 1380 (9th Cir.1984). The elements of tax evasion under § 7201 are "(1) the existence of a tax deficiency, (2) willfulness in attempted evasion of taxes, and (3) an affirmative act constituting an evasion or attempted evasion." *Id.* at 1377–78.

Boulware's convictions under §§ 7206(1) and 7201 hinge on the fact that he diverted funds from HIE but did not report them as income on his personal income tax returns. Boulware argues that although he controlled the funds in question, the government introduced no evidence that this control was inconsistent with ownership of the funds by HIE. Although the government argued to the jury that Boulware "stole" the money from HIE, the government did not establish any of the required elements of theft under Hawaii law. Finally, he argues, the diversions could not have constituted taxable constructive dividends, because HIE had no positive earnings or profits during the years charged in the indictment.

The sufficiency of the evidence issue boils down to whether the government could have proved the elements of §§ 7206(1) and 7201 beyond a reasonable doubt without proving either that Boulware stole the funds from HIE or that the funds were not loans or nontaxable returns of capital. *United States v. Miller,* 545 F.2d 1204 (9th Cir.1976), indicates that the answer to this question is "yes."

*Miller,* like this case, concerned the characterization of funds that a taxpayer diverted from his closely-held corporation. *Id.* at 1211. The defendant argued that his conviction for tax evasion could not stand, because the government had not proved that his corporation had any earnings and profits during the years in question. *Id.* at 1210. Therefore, his diversions must be treated as a return of capital. *Id.* at 1210–11. The court rejected this argument, stating that "[i]n a crim-

inal tax proceeding the concern is not over the type or the specific amount of the tax which the defendant has evaded, but whether he has willfully attempted to evade the payment or assessment of a tax." *Id.* at 1214. The court also held that the defendant had the burden of going forward once the government "demonstrates that the taxpayer had unexplained funds which *could be considered* as income which the taxpayer fails to report in his return." *Id.* at 1215 & n. 13 (emphasis added).

Boulware counters that the government did not make out a prima facie case on the false tax return and tax evasion counts because it used a bank-deposits method of proof and failed to investigate leads that were reasonably susceptible of being checked. In particular, HIE's comptroller testified to the grand jury that HIE had fully reported the $10.2 million at issue and submitted records in support of this contention. In addition, the government knew of a bankruptcy action in which the court affirmed the trustee's determination that assets held by Lee belonged to HIE.

 The theory behind the bank-deposits method of proof was described long ago, as follows:

> [I]f it be shown that a man has a business or calling of a lucrative nature and is constantly, day by day and month by month, receiving moneys and depositing them to his account and checking against them for his own uses, there is most potent testimony that he has income, and, if the amount exceeds exemptions and deductions, that the income is taxable.

*Gleckman v. United States*, 80 F.2d 394, 399 (8th Cir.1935) (quoted in 2 Kenneth E. North, *Criminal Tax Fraud* § 23.41, at 405 (3d ed.1998)). When using the bank-deposits method of proof, the government must conduct an adequate and full investigation to remove non-income deposits, such as transfers between bank accounts. *United States v. Stone,* 770 F.2d 842, 844 (9th Cir.1985). "The critical question is whether the government's investigation has provided sufficient evidence to support an inference that an unexplained excess in bank deposits is attributable to taxable income." *Id.* at 844–45. Although the government must be especially thorough in its investigation and presentation, "it is well settled that the government is not obliged to prove the exact amount of a deficiency so long as the taxpayer's understatement of income is substantial." *Id.* at 845.

Here, the government witness who performed the bank-deposits analysis, Jerry Yamachika, testified that he "eliminated ... any loans that may have come—that Mr. Boulware might have gotten from his company...." On cross-examination, Yamachika testified that he credited Boulware with deductions for money in the bank accounts that was used to buy coffee, and that "an analysis was done as to what credit he was given on his loan account at the corporation to reduce his loan for the purchases he made." Based on the testimony at trial, "[t]he evidence was more than adequate to support the inference that the defendant's bank deposits were income from [HIE] and were in fact currently taxable but unreported income." *Id.* at 845.

Boulware argues that even if the government did make out a prima facie case, he met his burden of going forward with the evidence by testifying that the diversions were loans and were accounted for as such on HIE's books. This put the burden back on the government to prove the deposits were not loans. The nature of the transactions, however, was sufficient evidence for a rational juror to conclude be-

yond a reasonable doubt that the deposits were not loans.

We conclude that there was ample evidence from which a rational juror could have concluded that Boulware was guilty of willfully submitting false tax returns for the 1989–1993 tax years and of willfully evading taxes for the 1994–1997 tax years.

## C. Other Asserted Trial Errors

■ Boulware further contends that his conviction should be reversed because of a number of asserted trial errors, including constructive amendment of the indictment by the prosecutor and prosecutorial misconduct. Most of these errors, however, were not objected to at trial; therefore, we would review them under the plain error rule of Fed.R.Crim.P. 52(b). *See, e.g. United States v. Dipentino*, 242 F.3d 1090, 1094 (9th Cir.2001). We see no useful purpose in reviewing these asserted errors. First, a ruling under plain error review will give the district court little assistance on retrial on how it should rule if a timely objection is made. Second, we will not assume that any trial error is likely to be repeated in a retrial.

■ We briefly address Boulware's Confrontation Clause claim, however, because it relates directly to his conviction for conspiracy to make false statements to a federally-insured financial institution. Boulware contends that the district court violated his rights under the Confrontation Clause by limiting his cross-examination of Lorin Kushiyama, his alleged co-conspirator on count 10. Whether limitations on cross-examination violate the Confrontation Clause is a question that we review de novo. *United States v. Adamson*, 291 F.3d 606, 612 (9th Cir.2002).

■ Boulware argues that the district court would not allow him to cross-examine Kushiyama about whether he agreed with Boulware to submit fraudulent invoices, an essential element of the conspiracy charge. The district court sustained a string of objections on relevance grounds to questions regarding whether Kushiyama had prepared invoices or appraisals for *other parties*. When defense counsel asked Kushiyama "As far as these invoices, you are not the—intending to submit fake invoices to anyone, were you?," the judge sustained the government's objection and defense counsel did not pursue the matter further.

Although it is not completely clear whether "these invoices" referred to those prepared for Boulware or to ones prepared for other customers, the court was obviously under the impression that they referred to invoices for other parties and defense counsel did nothing to disabuse him of this impression. Defense counsel did not reword the question, explain to the court that he was inquiring about the invoices at issue in this case, or call Kushiyama as a defense witness.

For these reasons, the limitation on the cross-examination of Kushiyama was not so severe as to amount to a violation of Boulware's Confrontation Clause rights.

## D. Sentencing Issues

■ Among other sentencing issues, Boulware contends that the district court erred in its calculation of the tax loss attributed to his offense, including the court's failure to hold an evidentiary hearing. In its cross-appeal the government contends that the district court erred in declining to enhance Boulware's sentence for obstruction of justice. Given our reversal and remand for a new trial on the tax counts, no purpose would be served by our review of the sentencing issues.

Sentence was imposed in this case well before *Blakely v. Washington*, —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), wrought a sea change in sentenc-

ing, and *United States v. Ameline,* 376 F.3d 967 (9th Cir.2004), held that *Blakely* was applicable to certain aspects of sentencing under the U.S. Sentencing Guidelines.[9] Under these circumstances, because we are reversing and remanding for a new trial on most counts, in the event there is a conviction (and in any event on the remaining, unreversed count) when the district court resentences Boulware, it will be under the then extant post-*Blakely* regime.

We must, however, address Boulware's challenge to the district court's forfeiture order, because we affirm his conviction for conspiracy to make false statements to a federally insured financial institution and because Boulware waived his right to a jury determination of the forfeiture issue.

▪ Boulware argues that the district court's forfeiture order was erroneous, because it did not give him credit for funds he returned to the lender. The jury convicted Boulware of renumbered count 10 of the indictment, conspiracy to make false statements to a federally-insured financial institution, but acquitted him of the substantive charges (counts 11–14). Renumbered count 15 of the indictment charged that Boulware shall forfeit proceeds that he obtained directly or indirectly as a result of the offenses charged in counts 10–14.

18 U.S.C. § 982(a)(2) provides:

The court, in imposing sentence on a person convicted of a violation of, or a conspiracy to violate—

(A) section ... 1014 ... of this title, affecting a financial institution ...

\* \* \*

shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation.

Nothing in the text of the statute entitles Boulware to a set-off for loan proceeds that he repaid to GECC. In fact, § 982(b)(1) incorporates the provisions of 21 U.S.C. § 853(c), which provides that "[a]ll right, title, and interest in property described in subsection (a) of this section vests in the United States upon the commission of the act giving rise to forfeiture under this section." Finally, that defendants may be required to pay restitution and forfeit the same amounts indicates that Boulware is not entitled to receive a credit for funds he returned. *Cf. United States v. Bright,* 353 F.3d 1114, 1125 (9th Cir.2004) (holding that forfeited funds need not be applied toward restitution); *United States v. Feldman,* 853 F.2d 648, 663–64 (9th Cir.1988) (holding that the sentencing option of ordering restitution "is not denied to the district court because a defendant must also forfeit the proceeds of illegal activity").

The district court did not err in failing to reduce the amount of the forfeiture. The criminal forfeiture statute contains nothing comparable to the civil forfeiture statute's provision that "[i]n cases involving fraud in the process of obtaining a loan or extension of credit, the court shall allow the claimant a deduction from the forfeiture to the extent that the loan was repaid, or the debt was satisfied, without any financial loss to the victim," Civil Asset Forfeiture Reform Act of 2000, Pub.L. 106–

---

9. The Supreme Court has granted certiorari in two cases, *United States v. Booker,* — U.S. —, 125 S.Ct. 11, — L.Ed.2d —, 2004 WL 1713654 (U.S. Aug. 2, 2004), and *United States v. Fanfan,* — U.S. —, 125 S.Ct. 12, — L.Ed.2d —, 2004 WL 1713655 (U.S. Aug. 2, 2004), which present the question of *Blakely's* application to the U.S. Sentencing Guidelines.

185, 114 Stat. 202, § 20(b), *codified at* 18 U.S.C. § 981(a)(2)(C).

## IV

We reverse Boulware's conviction for tax evasion and filing false tax returns and affirm his conviction for conspiracy to make false statements to a federally-insured financial institution. We vacate his sentence on the false statement count and remand for further proceedings consistent with this opinion.

**AFFIRMED in part, REVERSED in part, and REMANDED.**

SILVERMAN, Circuit Judge, dissenting:

In my view, the district court did not abuse its discretion in refusing to admit the state court judgment into evidence. The judgment does no more than establish that, as between Jin Sook Lee and Hawaiian Isles Enterprises, the money belonged to Hawaiian Isles Enterprises. This has no bearing on whether Boulware diverted corporate funds to his girlfriend for his own benefit without paying tax on the money. The judgment establishes only that *she* was not entitled to keep the cash. It does not prove, or even tend to prove, that *he* didn't siphon off the money from the corporation, tax-free. Why would it? That was not at issue in the case.

District courts have wide latitude in ruling on the relevancy of evidence. *United States v. Alvarez*, 358 F.3d 1194, 1216 (9th Cir.2004). Implicit in any such ruling is an evaluation of probative value. 1 McCormick on Evidence § 185, at 637 (5th ed. 1999) ("There are two components to relevant evidence: materiality and probative value."). Because the state court judgment against Lee sheds little if any light on whether Boulware committed tax evasion, I would hold that the district court did not abuse its discretion in ruling the

Hawaiian judgment inadmissible. I would affirm the district court and, therefore, respectfully dissent.